KOSCIUSKO OIL MILL & FERTILIZER COMPANY *v.* WILSON COTTON OIL COMPANY.

[43 South., 435; 8 L. R. A. (N. S.,) 1053.]

TRUSTS AND COMBINES. *Contracts. Laws* 1900, *ch.* 88, *p.* 125.

    A contract between two cotton seed oil manufacturers is invalid, where it purports to bind one of them, in consideration of the withdrawal by the other of an agent for the purchase of cotton seed from designated territory, to protect the other from liability to the withdrawn agent and furnish an agreed quantity of seed during the season at a named price, under Laws 1900, ch. 88, p. 125, defining a trust or combine to be, among other things, a combination to hinder competition in the purchase of a commodity, and making illegal every contract relative to the business of a trust or combine.

FROM the circuit court of Holmes county.

HON. A. McC. KIMBROUGH, Judge.

The Kosciusko Oil Mill & Fertilizer Company, appellant, was the plaintiff in the court below; the Wilson Cotton Oil Company, appellee, was defendant there. From a judgment in favor of the defendant, predicated of a peremptory instruction, the plaintiff appealed to the supreme court.

The opinion of the court states the facts.

*Noel & Pepper,* for appellant.

*Tackett & Smith,* for appellee.

[The briefs of counsel on both sides were lost and did not reach the reporter; hence a synopsis cannot be given of them.]

Whitfield, C. J., delivered the opinion of the court.

This is a suit in assumpsit, in which appellant is the plaintiff and appellee is defendant, wherein the plaintiff seeks to recover damages alleged to have been sustained by it by reason of defendant's breach of a contract entered into between them on the 28th day of September, A. D. 1903. At the close of plaintiff's evidence the court, on motion of defendant, excluded same from consideration by the jury and instructed the jury to find for the defendant, which was done by the jury, and judgment rendered accordingly.

The statute which it is alleged makes the contract in question void is, so far as its provisions affect this case, as follows:

"An act to define trusts and combines, to provide for the suppression thereof, and to preserve to the people of this state the benefits arising from competition in business.

"Section 1. Be it enacted by the legislature of the state of Mississippi, that a trust and combine is a combination, contract, understanding or agreement, express or implied, between two or more persons, corporations, or firms or associations of persons, or between one or more of either with one or more of the other: (a) In restraint of trade; (b) to limit, increase or reduce the price of a commodity; . . . (d) intended to hinder competition in the sale or purchase of a commodity; . . . (i) to unite or pool interests in the importation, manufacture, production, transportation, or price of a commodity—and is inimical to the public welfare, unlawful and a criminal conspiracy."

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

"Section 3. Every contract or agreement to enter into or pursue any trust and combine, and every contract or agreement made by another with any trust and combine, or with any member of a trust and combine, for any purpose relative to the business of such trust and combine, is void, and cannot be enforced in any court."

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

"Section 11. This act shall be liberally construed in all courts, to the end that trusts and combines may be suppressed, and the benefits arising from competition in business preserved to the people of this state."

Laws 1900, pp. 125, 126, 129, c. 88.

It will be noted that the title of this act is "An act to provide for the suppression of combines and trusts and to preserve to the people of this state the benefits arising from competition in business," and that sec. 11 expressly requires all courts in this state to liberally construe this act, to the end that trusts may be suppressed and the benefits arising from competition in business preserved to the people of this state.

On, prior, and subsequent to the 28th day of September, A. D. 1903, appellant and appellee were both engaged in the business of purchasing cotton seed and converting same into oil, meal, and other manufactured articles; appellant's mill being located at Kosciusko, and appellee's at Lexington, Mississippi. One Potts was president and C. A. Jones was secretary and treasurer of appellant company, and G. A. Wilson was president of appellee company; both being corporations. On the 28th day of September, A. D. 1903, C. A. Jones came to Lexington for the purpose of establishing a seed agency for appellant, and entered into a contract with one J. M. Clower to purchase seed at said place for appellant during the seed season then commencing. After this contract with Clower had been made, but as part of the same transaction, and just afterwards, the contract sued on was entered into between appellant and appellee, and what occurred relative to the making thereof can best be told in the language of Jones himself. He was asked this question: "Examine the paper now shown you, and see who wrote it, and when it was written." To which he made the following answer: "September 28th was the date. I wrote this contract, the one for Mr. Clower, and the one for the seed was written by Mr. Wilson. I came to Lexington under the instructions of Mr. Potts to establish a seed agency here and to

secure a house and men, and I was instructed to go to Mr. Wilson and tell him we were not coming into his town through any personal animosity to him, but simply on a matter of business, as other people were buying in our town, and I made that statement to Mr. Wilson, and he brought up something about an agreement and I told him where he could find Mr. Potts (that is, over the phone), and he claimed he never got him, and he did talk to our vice-president, and he told him whatever I did in the premises was satisfactory; and I went to Mr. Wilson's house two or three times, and told him I was compelled to make arrangements here, and he made me a proposition to ship us three hundred tons of seed, provided we would not buy here, and would hire Mr. Clower and turn the contract over to him, and he would pay this, pay his salary, and this contract was the outcome of that agreement."

The contract referred to in the latter part of Jones' answer, and the one sued on, is as follows:

"This contract, made this the 28th September, 1903, by and between Wilson Cotton Oil Co., of first part, and Kosciusko Oil Mill & Fertilizer Co., of second part, shows that in consideration of (300) three hundred tons of sound cotton seed, to be shipped to the second party during the season 1903–4 by the first party at Lexington, Miss., prices then being paid from Sidon, Miss., or from points where the freight rate is not greater to Kosciusko, the second party has this day assigned to the first party a contract it has with one J. M. Clower to buy seed in Lexington, and the first party is to pay the salary and charges therein mentioned as they fall due each month, and to furnish a seedhouse and scales to use in buying seed during the months of October, November, and December, 1903, and to furnish money to pay for the seed bought by the said Clower, through to second party, and by the second party deposited in the Bank of Commerce of Lexington, Miss., which is to be paid out on the said tickets issued by said Clower; and the seed so bought is to be the property of the first party

and subject to its control as soon as bought. The second party agrees to keep this contract a secret and not to inform said Clower or any one else of its terms. The Lexington prices not to exceed the prevailing prices at point of shipment and seed to be delivered for shipment to second party by February 1, 1904. The prices of seed to be paid by said Clower are to be dictated by the first party at any and all times, and the reports made by said Clower to the second party are to be forwarded to the first party by mail or express. [Signed] Wilson Cotton Oil Company, by G. A. Wilson, President Kosciusko Oil Mill & Fertilizer Company, by C. A. Jones, Secretary and Treasurer."

After the execution of this contract, appellant withdrew from competition with appellee in the purchase of seed at Lexington, and on the failure of appellee to ship it the three hundred tons of seed referred to in said contract this suit was instituted to recover the profit appellant alleged that it would have made by crushing and manufacturing said seed.

It will be observed that the contract, set out above, of the 28th of September, 1903, between the two oil mills, is the contract sued on, and it is too plain to need discussion that the express object of that contract was to suppress competition in the territory about Lexington in the purchase of cotton seed. It is impossible for language to make such illegal purpose plainer. It will also be noted that the testimony in the case establishes beyond controversy the fact that the execution of this contract actually had the effect of securing to the Lexington oil mill a monopoly in the purchase of cotton seed in that territory; the appellant withdrawing from that territory immediately upon the execution of this contract. It will be specially noted that the witness Jones said this contract here sued on was "the outcome of the agreement" that the appellant would not buy cotton seed in the Lexington territory. This contract, therefore, is not like the contract in the case of *Connolly* v. *Union Sewer Pipe Co.,* 184 U. S., 547, 22 Sup. Ct., 434,

46 L. Ed., 679.   It was said there "that the plaintiff's cause of
action is in no legal sense dependent upon, or affected by, the
alleged illegality of the trust or combination, because the ille-
gality, if any, is entirely collateral to the transaction in ques-
tion, and the court is not called upon, in this action, to enforce
any contract tainted with illegality, or contrary to public pol-
icy."   The direct converse is true here.   The contract upon
which the plaintiff sues is directly connected with, and, as the
witness states, grows directly out of, the contract to suppress
competition, and this contract could not possibly be enforced
without aid from the contract out of which it grows, and with-
out calling that contract into view.   This contract sued on is
simply the consummate flower of the other contract, out of
which it grows, which is the stem.   This contract is directly
and inseparably connected with the trust combination out of
which it grows.   There can be no doubt, under this state of
facts, that this contract here sued on is absolutely void under
section three of the anti-trust act (Laws 1900, p. 126, c. 88),
and that the instruction of the court was correct.   We said in
the case of *Yazoo, etc., Railroad Co.* v. *Searles,* 85 Miss.,
528, 37 South., 942, that the phrase "inimical to the public
welfare" was a legislative declaration that all the contracts
condemned by this anti-trust statute were so "inimical, were
unlawful, and were a criminal conspiracy."   It is not left to
the courts to say that such contracts are inimical to the public
welfare, but the legislature itself has characterized such con-
tracts as being inimical to the public welfare by this legislative
declaration.   Whenever, therefore, it is shown that a contract
is of the kind mentioned in the act, it is by legislative declara-
tion instantly made a contract "inimical to the public welfare,
unlawful, and a criminal conspiracy."   The case of *Yazoo, etc.
Railroad Co.* v. *Searles,* 85 Miss., 528, 37 South., 942, ex-
pressly declares that "the benefits which the legislature sought
to secure to the people of the state were those which naturally
flow from competition in business."   That case again declared

that "all contracts whether expressed or implied, which would necessarily or probably have any of the ill effects therein forbidden, were declared to be violative of the announced public policy of the state, in that they inevitably tended to reduce the benefits sought to be secured by the act." And again that case declared that "the test, and the only test, in determining the validity of a contract under this act, is not what the intent of the parties may be, not what form the combination has taken, but what will its probable effect be ?"

The probable effect of the contract in this case is manifestly to suppress all competition within the territory named in the purchase of cotton seed. Nor is it any answer to say, if the fact had been so, that competition in the purchase of cotton seed was not in fact destroyed, or that the price of seed was not in fact reduced; the necessary tendency of the contract being to that end. The supreme court of Ohio, in *Central Ohio Salt Co.* v. *Guthrie,* 35 Ohio St., 666, replying to this very argument, said: "The courts will not stop to inquire as to the degree of injury inflicted upon the public. It is enough to know that the inevitable tendency of such contracts is injurious to the public." And this language was approved by the supreme court of the United States in *Northern Securities Co.* v. *United States,* 193 U. S., 340, 24 Sup. Ct., 436, 48 L. Ed., 679; and in the case of *C. E. Knight Co.,* 156 U. S., 16, 15 Sup. Ct., 249, 39 L. Ed., 325, the court said: "Again all the authorities agree that, in order to vitiate a contract or combination, it is not required that its result should be a complete monopoly. It is sufficient if it really tends to that end and to deprive the public of the advantages which flow from free competition." And in *Addyston Pipe & Steel Co.* v. *United States,* 175 U. S., 244, 20 Sup. Ct., 108, L. Ed., 136, the court said: "Total suppression of the trade in the commodity is not necessary in order to render the combination one in restraint of trade. It is the effect of the combination, in limiting and restraining the right of each of the members to transact business in the ordinary

way, as well as its effect upon the volume or extent of the dealing in the community that is regarded." In *Insurance Companies* v. *State,* 75 Miss., 24, 22 South., 99, we said, some ten years since: "Conspiracies of this class are raised to the grade of felony, and pronounced obnoxious to the public policy of this state and inimical to the public welfare, by reason of the great mischief they are known of all men to accomplish, as manifested by the course of legislation and decision the country over. Such trusts constitute one of the greatest menaces to public welfare known to modern times, and the legislature has wisely made them felonies, and denounced this severe penalty against them." What has occurred in the decade since that expression was uttered by this court has put its truthfulness in tenfold clearer light. The question of the political day is whether the trusts shall own and control the government, or whether the government shall regulate these trusts, so outrageous have their iniquitous practices become. It is the duty of this court to obey the mandate of the legislature to construe this act liberally, to the end that trusts shall be suppressed, and competition, open and fair, be maintained within the borders of this state.

Section 4 of the anti-trust act, *supra* (Laws 1900, p. 127, c. 88), provides as follows: "Every corporation which shall be a trust and combine or enter into, be concerned in, or share in the profit or loss of any trust and combine shall forfeit its charter and franchise, and if a foreign corporation, shall forfeit its right to do business in this state. It is hereby made the duty of the attorney-general of this state to enforce this provision by a proceeding in the nature of writ of *quo warranto* or any other appropriate remedy upon his own motion, or upon the relation of any person whose rights are invaded or interests threatened by any trust and combine." The able and accomplished attorney-general will doubtless promptly proceed against the members of this trust; the evidence in this case

clearly establishing the fact that a trust existed between the two corporations involved.

*The judgment is affirmed.*