EASTERN STATES RETAIL LUMBER DEALERS' ASSOCIATION *v.* UNITED STATES.

McBRIDE, INDIVIDUALLY AND AS PRESIDENT OF THE RETAIL LUMBERMEN'S ASSOCIATION OF PHILADELPHIA, *v.* THE UNITED STATES.

APPEALS FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

Nos. 511, 550.   Argued October 24, 27, 1913.—Decided June 22, 1914.

Conspiracies are seldom capable of proof by direct testimony and a conspiracy to accomplish that which is their natural consequence may be inferred from the things actually done.

The Sherman Law, as construed by this court in the *Standard Oil Case,* while not reaching normal and usual contracts incident to lawful purposes and in furtherance of legitimate trade, does broadly condemn all combinations and conspiracies which restrain the free and natural flow of trade in the channels of interstate commerce.

*Held* in this case that the circulation of a so-called official report among members of an association of retail dealers calling attention to actions

of listed wholesale dealers in selling direct to consumers, tended to prevent members of the association from dealing with the listed dealers referred to in the report, and to directly and unreasonably restrain trade by preventing it with such listed dealers, and was within the prohibitions of the Sherman Law.

While a retail dealer may unquestionably stop dealing with a wholesaler for any reason sufficient to himself, he and other dealers may not combine and agree that none of them will deal with such wholesaler without, in case interstate commerce is involved, violating the Sherman Law.

An act, harmless when done by one person, may become a public wrong when done by many acting in concert in pursuance of a conspiracy. *Grenada Lumber Co.* v. *Mississippi*, 217 U. S. 433.

201 Fed. Rep. 581, affirmed.

THE facts, which involve the determination of whether an arrangement between certain retail lumbermen's associations in regard to their relations with wholesale dealers amounted to a combination and conspiracy in restraint of trade within the prohibitions of the Sherman Act, are stated in the opinion.

*Mr. Alfred B. Cruikshank* for appellants in No. 511, and *Mr. Howard Taylor,* with whom *Mr. Charles E. Morgan, Mr. C. E. Morgan, 3d,* and *Mr. Charles B. Brophy* were on the brief, for appellants in No. 550:

The Sherman Act prohibits undue limitations on competitive conditions.

The combination, or concerted action, of these defendants in distributing circulars stating the true position of lumbermen in the trade, was not a combination which unduly restrained competition.

The true question under the English and American authorities is whether the circulation of the "Official Lists" is a reasonable defensive measure or is an unreasonable, offensive and malicious means to eliminate competition.

There was no combination or concert of action among defendants to boycott those whose names appeared on the "Official Reports."

The evidence concerning past occurrences, if relevant at all, tends to establish that the defendants' present intent is right and law abiding.

These present appellants are not responsible for the actions of individuals in other local associations.

There was no confederation among the various local associations, except with respect to the circulation of the "Official Reports."

No absurdities were contemplated by the Sherman Act.

In support of these contentions, see *Aikens* v. *Wisconsin*, 195 U. S. 194; *Allan* v. *Flood,* App. Cas. 1898, 1; *Bohn Mfg. Co.* v. *Hollis*, 54 Minnesota, 223; *Carew* v. *Rutherford*, 106 Massachusetts, 1, 14; *Central Lumber Co.* v. *South Dakota*, 226 U. S. 157; *Collins* v. *American News Co.*, 34 Misc. 260; *S. C.*, aff'd, 68 App. Div. 639; *Continental Ins. Co.* v. *Underwriters*, 67 Fed. Rep. 310, 320; Cooke on Combinations (2d ed.), c. V; Cooley on Torts (2d ed.), 328; *Dueber Watch Co.* v. *Howard*, 55 Fed. Rep. 851, 854; *S. C.*, 66 Fed. Rep. 637, 645; *Ertz* v. *Produce Exchange*, 79 Minnesota, 140, 144; *Gompers* v. *Bucks Stove Co.*, 221 U. S. 418, 436; *Grenada Lumber Co.* v. *Mississippi*, 217 U. S. 433, 441; *Lawlor* v. *Loewe*, 187 Fed. Rep. 522, 526; *Loewe* v. *Lawlor*, 208 U. S. 274, 291; *Macauley Bros.* v. *Tierney*, 19 R. I. 255, 259; *Mills* v. *United States Printing Co.*, 99 App. Div. (N. Y.) 605; *Mogul Steamship Co.*, App. Cas. 1892, 25; *S. C.*, L. R. 23, Q. B. 598, 614; *Montgomery Ward Co.* v. *South Dakota Retail Ass'n*, 150 Fed. Rep. 413; *Nash* v. *United States*, 229 U. S. 373; *National Protective Ass'n* v. *Cuming*, 170 N. Y. 315; *Quinn* v. *Lathem*, App. Cas. 1901, 495, 512; *Standard Oil Co.* v. *United States*, 221 U. S. 1, 58; *State* v. *Adams Lumber Co.*, 81 Nebraska, 392, 412; *Toledo &c. Ry. Co.* v. *Pennsylvania Co.*, 54 Fed. Rep. 730, 738; *United States* v. *Trans-Missouri Association*, 166 U. S. 290, 337; *United States* v. *Kissel*, 218 U. S. 601; *United States* v. *Amer. Tobacco Co.*, 221 U. S. 106, 177; *United States* v. *St. Louis Terminal*, 224 U. S. 383,

394; *United States* v. *Reading Co.*, 226 U. S. 324; *United States* v. *Un. Pac. R. R. Co.*, 226 U. S. 61, 84; *Wabash R. R. Co.* v. *Hannahan*, 121 Fed. Rep. 563, 569; *Walker* v. *Cronin*, 107 Massachusetts, 555, 564.

*Mr. Assistant to the Attorney General Todd* for the United States:

The evidence establishes an agreement or combination between the defendant retailers to prevent wholesalers from selling directly to consumers by refusing to buy from (boycotting) them if they do. This is shown by the declared purpose of the defendant associations as disclosed by their constitutions and by-laws; the compilation and circulation of the so-called "official reports" or black-lists; the actual course of conduct of defendants in concertedly withdrawing their patronage from listed wholesalers; admissions of members of defendant associations, and other testimony showing general recognition of and obedience to a tacit or moral obligation upon members so to withdraw their patronage. The inference of an agreement to boycott is confirmed by the decisions of other courts in conspiracy cases. *Commonwealth* v. *McLean*, 2 Pars. (Pa.) 367; 3 Greenleaf on Ev., § 93; *Patnode* v. *Westenhaver*, 114 Wisconsin, 460; *Regina* v. *Murphy*, 8 C. & P. 397; *Reilley* v. *United States*, 106 Fed. Rep. 896; *State* v. *Adams Lumber Co.*, 81 Nebraska, 392; *United States* v. *Sacia*, 2 Fed. Rep. 754; *Webb* v. *Drake*, 26 So. Rep. (La.) 791; 2 Wharton, Criminal Law, § 1398.

An agreement or combination by retailers to refuse to buy from (boycott) wholesalers who sell directly to consumers interferes with the free and normal flow of trade and therefore violates the Anti-trust Act. *Bailey* v. *Master Plumbers' Ass'n*, 103 Tennessee, 99; *Beck* y. *Railway Teamsters' Union*, 42 L. R. A. 407; *Bohn Mfg. Co.* v. *Hollis*, 54 Minnesota, 223; *Boutwell* v. *Marr*, 71 Vermont, 1; *Brown* v. *Jacobs Phar. Co.*, 115 Georgia, 429; *Casey* v.

*Cincinnati Typographical Union,* 45 Fed. Rep. 135; *Doremus* v. *Hennesy,* 176 Illinois, 608; *Ellis* v. *Inman,* 131 Fed. Rep. 183; *Gompers* v. *Bucks Stove Co.,* 221 U. S. 418; *Same* v. *Same,* 33 App. D. C. 83; *Grenada Lumber Co.* v. *Mississippi,* 217 U. S. 433; *Hawarden* v. *Youghiogheny Coal Co.,* 111 Wisconsin, 545; *Hopkins* v. *Oxley Stave Co.,* 83 Fed. Rep. 912; *Jackson* v. *Stanfield,* 137 Indiana, 592; *Klingel's Pharmacy* v. *Sharp,* 104 Maryland, 218; *Loewe* v. *Lawlor,* 208 U. S. 274; *Lucke* v. *Clothing Cutters Ass'n,* 77 Maryland, 396; *Macauley Bros.* v. *Tierney,* 19 R. I. 255; *Montgomery Ward & Co.* v. *So. Dak. Merchants' Ass'n,* 150 Fed. Rep. 413; *Montague* v. *Lowry,* 193 U. S. 38; *Olive* v. *Van Patten,* 7 Tex. Civ. App. 630; *Purington* v. *Hinchliff,* 219 Illinois, 159; *Retail Dealers' Ass'n* v. *State,* 48 So. Rep. (Miss.) 1021; *State* v. *Adams Lumber Co.,* 81 Nebraska, 393; *Steers* v. *United States,* 192 Fed. Rep. 1; *Thomas* v. *C., N. O. & T. P. R. Co.,* 62 Fed. Rep. 803; *Webb* v. *Drake,* 26 So. Rep. (La.) 791.

Viewing the agreement or combination between the defendants merely as one to circulate amongst themselves lists of wholesalers who sell directly to consumers, it unreasonably restricts competition between wholesalers and retailers in selling to consumers and therefore violates the Anti-trust Act. *Am. Tobacco Co.* v. *United States,* 221 U. S. 106; *Nash* v. *United States,* 229 U. S. 373; *Quinn* v. *Leatham* (1901), A. C. 495; *Standard Oil Co. Case,* 221 U. S. 1.

The plea that this combination was a reasonable and necessary measure to defend the position of retailers in the trade is irrelevant in law and unfounded in fact. *Ches. & Ohio Fuel Co.* v. *United States,* 115 Fed. Rep. 610; *Grenada Lumber Co.* v. *Mississippi,* 217 U. S. 433; *Loewe* v. *Lawlor,* 187 Fed. Rep. 522.

MR. JUSTICE DAY delivered the opinion of the court.

These are appeals from a decree of the District Court of the United States for the Southern District of New York

in an action brought by the United States under the Sherman Anti-Trust Act (July 2, 1890, c. 647, 26 Stat. 209), having for its object an injunction against certain alleged combinations of retail lumber dealers, which, it was averred, had entered into a conspiracy to prevent wholesale dealers from selling directly to consumers of lumber. The defendants are various lumber associations composed largely of retail lumber dealers in New York, New Jersey, Pennsylvania, Connecticut, Massachusetts, Rhode Island, Maryland and the District of Columbia, and the officers and directors of the associations. The record is very voluminous, but the facts essential to a consideration of the decree of the District Court are in comparatively narrow compass. While the record also concerns practices which are said to have been abandoned, the decree entered, declaring the defendants named to be in a combination or conspiracy to restrict and restrain competition, depends solely upon the method adopted and being used by the defendants in the distribution of the information contained in a certain document known as the "Official Report," the form of which, set forth in the decree, is as follows:

"OFFICIAL REPORT.

"(Name of the Particular Association Circulating it.)

"STATEMENT TO MEMBERS (WITH THE DATE).

"You are reminded that it is because you are members of our Association and have an interest in common with your fellow members in the information contained in this statement, that they communicate it to you; and that they communicate it to you in strictest confidence and with the understanding that you are to receive it and treat it in the same way.

"The following are reported as having solicited, quoted or as having sold direct to the consumers:

"(Here follows a list of the names and addresses of various wholesale dealers.)

"Members upon learning of any instance of persons
soliciting, quoting, or selling direct to consumers, should
at once report same, and in so doing should, if possible,
supply the following information:

"The number and initials of car.

"The name of consumer to whom the car is consigned.

"The initials or name of shipper.

"The date of arrival of car.

"The place of delivery.

"The point of origin";

and the defendants were enjoined from combining, con-
spiring or agreeing together to distribute and from dis-
tributing to members of the associations named or any
other person or persons any information showing soliciting,
quotations, or sales and shipments of lumber and lumber
products from manufacturers and wholesalers to con-
sumers of or dealers in lumber, and from the preparation
and distribution of the lists above described as the "Offi-
cial Report" or the use of a similar device.

The record discloses that the defendant associations
are constituted largely of retail lumber dealers, each of
whom has the natural desire to control his local trade,
which the retailers contend has been unduly interfered
with by the wholesalers in selling to consumers within
the local territory in such wise as to conflict with what they
regard as a strictly local trade, and it appears that the
defendant associations have for their object, among other
things, the adoption of ways and means to protect such
trade and to prevent the wholesale dealers from intruding
therein. The particular thing which this case concerns
in the retailers' efforts to promote the end in view is the
attempt in the manner shown, by the circulation of the
reports in question, to keep the wholesalers from selling
directly to the local trade. The trade of the wholesalers
involved covers a number of states, and there is no ques-
tion but that the supplying of lumber to the large num-

bers of retailers in these associations in different States is interstate trade and that if the practices are illegal within the Sherman Act they may be reached by this proceeding. *Swift & Co.* v. *United States,* 196 U. S. 375; *Loewe* v. *Lawlor,* 208 U.-S. 274, 300.

The record discloses a systematic circulation among the members of the defendant associations of the official report above quoted. The method of operation as stated by the learned counsel for the appellants is thus summarized in his brief:

"The names on this list are obtained and placed thereon as the result of complaints made by individual retailers. When an individual member of a retail association learns of a sale by a wholesaler to one of the customers of the retailer he may complain in writing to the secretary of his association, whose duty it is thereupon to ascertain the facts by correspondence with the wholesaler in question and such other means as may seem proper. Should the report or complaint be without proper foundation or should the secretary become satisfied that the matter is a trifling one or the result of inadvertence, the incident usually terminates at this point; but should the complaint appear to be serious and well founded the case is submitted to the board of directors of the retail association at its next meeting and should the board be satisfied that the wholesaler is generally making a practice of selling to consumers or customers of the retail trade, the secretary is directed to report the name of such wholesaler for the official list. Thereupon the secretary sends the name to Mr. Crary of New York who adds it upon the next report to the names of those already thereupon. Each report contains the names of all wholesalers who have been reported from the very beginning as selling to consumers and whose names have not been removed for cause. The reports or lists after being printed in New York are distributed amongst the secretaries of the defendant associa-

tions; those for each association being marked with its name and in that way only being distinguished from those sent to the other associations. The secretary of each association then distributes the lists to his members. Should any wholesaler desire to have his name removed from the list he can have it done upon satisfactory assurance to the local secretary that he is no longer selling in competition with the retailers. In practice the greatest care is taken to make the list accurate, and as a matter of fact, it only contains the names of such wholesalers as are absolutely committed to the practice of competing with retailers for the custom of builders and contractors."

The reading of the official report shows that it is intended to give confidential information to the members of the associations of the names of wholesalers reported as soliciting or selling directly to consumers, members upon learning of any such instances being called upon to promptly report the same, supplying detailed information as to the particulars of the transaction. When viewed in the light of the history of these associations and the conflict in which they were engaged to keep the retail trade to themselves and to prevent wholesalers from interfering with what they regarded as their rights in such trade there can be but one purpose in giving the information in this form to the members of the retail associations of the names of all wholesalers who by their attempt to invade the exclusive territory of the retailers, as they regard it, have been guilty of unfair competitive trade. These lists were quite commonly spoken of as blacklists, and when the attention of a retailer was brought to the name of a wholesaler who had acted in this wise it was with the evident purpose that he should know of such conduct and act accordingly. True it is that there is no agreement among the retailers to refrain from dealing with listed wholesalers, nor is there any penalty annexed for the failure so to do, but he is blind indeed who does not see the

purpose in the predetermined and periodical circulation of this report to put the ban upon wholesale dealers whose names appear in the list of unfair dealers trying by methods obnoxious to the retail dealers to supply the trade which they regard as their own. Indeed this purpose is practically conceded in the brief of the learned counsel for the appellants:

"It was and is conceded by defendants and the Court below found that the circulation of this information would have a natural tendency to cause retailers receiving these reports to withhold patronage from listed concerns. That was of course the very object of the defendants in circulating them."

In other words, the circulation of such information among the hundreds of retailers as to the alleged delinquency of a wholesaler with one of their number had and was intended to have the natural effect of causing such retailers to withhold their patronage from the concern listed.

The Sherman Act has been so frequently and recently before this court as to require no extended discussion now. *Standard Oil Co.* v. *United States,* 221 U. S. 1; *United States* v. *American Tobacco Co.,* 221 U. S. 106; *United States* v. *St. Louis Terminal,* 224 U. S. 383; *Standard Sanitary Mfg. Co.* v. *United States,* 226 U. S. 20; *United States* v. *Union Pacific R. R. Co.,* 226 U. S. 61; *United States* v. *Reading Co.,* 226 U. S. 324; *United States* v. *Patten,* 226 U. S. 525; *Nash* v. *United States,* 229 U. S. 373; *Straus* v. *American Publishers' Ass'n,* 231 U. S. 22. It broadly condemns all combinations and conspiracies which restrain the free and natural flow of trade in the channels of interstate commerce. It is true that this court held in the *Standard Oil* and *Tobacco Cases, supra,* and in the subsequent cases following them, that in its proper construction the act was not intended to reach normal and usual contracts incident to lawful purposes and intended to

further legitimate trade, and summarizing the meaning of the act in the *Tobacco Case*, this court said (221 U. S. 179):

"Applying the rule of reason to the construction of the statute, it was held in the *Standard Oil Case* that as the words 'restraint of trade' at common law and in the law of this country at the time of the adoption of the Anti-trust Act only embraced acts or contracts or agreements or combinations which operated to the prejudice of the public interests by unduly restricting competition or un-duly obstructing the due course of trade or which, either because of their inherent nature or effect or because of the evident purpose of the acts, etc., injuriously restrained trade, that the words as used in the statute were designed to have and did have but a like significance."

The same principle was affirmed in *Nash* v. *United States, supra.* The court in the *Standard Oil Case* con-strued the act as intended to reach only combinations unduly restrictive of the flow of commerce or unduly re-strictive of competition, and, illustrating what were such undue or unreasonable combinations, it classed as illegal (p. 58) "all contracts or acts which were unreasonably restrictive of competitive conditions, either from the nature or character of the contract or act or where the surrounding circumstances were such as to justify the conclusion that they had not been entered into or per-formed with the legitimate purpose of reasonably for-warding personal interest and developing trade, but on the contrary were of such a character as to give rise to the inference or presumption that they had been entered into or done with the intent to do wrong to the general public and to limit the right of individuals, thus restrain-ing the free flow of commerce and tending to bring about the evils, such as enhancement of prices, which were con-sidered to be against public policy." And in *Loewe* v. *Lawlor, supra,* this court held that a combination to boy-

cott the hats of a manufacturer and deter dealers from
buying them in order to coerce the manufacturer to a
particular course of action with reference to labor or-
ganizations, the effect of the combination being to com-
pel third parties and strangers not to engage in a course
of trade except upon conditions which the combination
imposed, was within the Sherman Act. In *Gompers* v.
*Bucks Stove & Range Co.*, 221 U. S. 418, after citing *Loewe*
v. *Lawlor, supra,* this court said (p. 438):

"But the principle announced by the court was gen-
eral. It [the Sherman Act] covered any illegal means by
which interstate commerce is restrained, whether by un-
lawful combinations of capital, or unlawful combinations
of labor; and we think also whether the restraint be oc-
casioned by unlawful contracts, trusts, pooling arrange-
ments, blacklists, boycotts, coercion, threats, intimidation,
and whether these be made effective, in whole or in part,
by acts, words or printed matter."

And see *Montague & Co.* v. *Lowry,* 193 U. S. 38.

These principles are applicable to this situation. Here
are wholesale dealers in large number engaged in inter-
state trade upon whom it is proposed to impose as a condi-
tion of carrying on that trade that they shall not sell in
such manner that a local retail dealer may regard such
sale as an infringement of his exclusive right to trade,
upon pain of being reported as an unfair dealer to a large
number of other retail dealers associated with the offended
dealer, the purpose being to keep the wholesaler from
dealing not only with the particular dealer who reports
him but with all others of the class who may be informed
of his delinquency. "Section 1 of the act, . . . is
not confined to voluntary restraints, as where persons
engaged in interstate trade or commerce agree to suppress
competition among themselves, but includes as well in-
voluntary restraints, as where persons not so engaged con-
spire to compel action by others, or to create artificial

conditions, which necessarily impede or burden the due course of such trade or commerce or restrict the common liberty to engage therein." *United States* v. *Patten, supra,* p. 541. This record abounds in instances where the offending dealer was thus reported, the hoped for effect, unless he discontinued the offending practice, realized, and his trade directly and appreciably impaired.

But it is said that in order to show a combination or conspiracy within the Sherman Act some agreement must be shown under which the concerted action is taken. It is elementary, however, that conspiracies are seldom capable of proof by direct testimony and may be inferred from the things actually done, and when in this case by concerted action the names of wholesalers who were reported as having made sales to consumers were periodically reported to the other members of the associations, the conspiracy to accomplish that which was the natural consequence of such action may be readily inferred

The circulation of these reports not only tends to directly restrain the freedom of commerce by preventing the listed dealers from entering into competition with retailers, as was held by the District Court, but it directly tends to prevent other retailers who have no personal grievance against him and with whom he might trade from so doing, they being deterred solely because of the influence of the report circulated among the members of the associations. In other words, the trade of the wholesaler with strangers was directly affected, not because of any supposed wrong which he had done to them, but because of the grievance of a member of one of the associations, who had reported a wrong to himself, which grievance when brought to the attention of others it was hoped would deter them from dealing with the offending party. This practice takes the case out of those normal and usual agreements in aid of trade and commerce which may be found not to be within the act and puts it within the pro-

hibited class of undue and unreasonable restraints, such as was the particular subject of condemnation in *Loewe* v. *Lawlor, supra.*

The argument that the course pursued is necessary to the protection of the retail trade and promotive of the public welfare in providing retail facilities is answered by the fact that Congress, with the right to control the field of interstate commerce, has so legislated as to prevent resort to practices which unduly restrain competition or unduly obstruct the free flow of such commerce, and private choice of means must yield to the national authority thus exerted. *Addyston Pipe Co.* v. *United States,* 175 U. S. 211, 241, 242.

*Anderson* v. *United States,* 171 U. S. 604, is cited and relied upon by the appellants. In that case this court sustained, as against an attack under the Sherman Law, the legality of an association called the Traders' Live Stock Exchange in Kansas City. An agreement among purchasers of cattle for the purpose of regulating and controlling the local business among themselves had been entered into, and one of the rules provided that the members of the exchange should not deal with any other yard trader unless he was a member of such exchange. It was said (p. 613):

"There is no evidence that these defendants have in any manner other than by the rules above mentioned hindered or impeded others in shipping, trading or selling their stock, or that they have in any way interfered with the freedom of access to the stock yards of any and all other traders and purchasers, or hindered their obtaining the same facilities which were therein afforded by the stock yards company to the defendants as members of the exchange, and we think the evidence does not tend to show that the above results have flowed from the adoption and enforcement of the rules and regulations referred to."

As distinguished from this situation the present case shows that the trade of the listed wholesalers is hindered or impeded; that competition is suppressed and the natural flow of commerce interfered with as the direct result of the circulation of the official reports in the manner stated. The case is quite different from the *Anderson Case*. And see *Montague & Co.* v. *Lowry, supra,* p. 48.

A retail dealer has the unquestioned right to stop dealing with a wholesaler for reasons sufficient to himself, and may do so because he thinks such dealer is acting unfairly in trying to undermine his trade. "But," as was said by Mr. Justice Lurton, speaking for the court in *Grenada Lumber Co.* v. *Mississippi,* 217 U. S. 433, 440, "when the plaintiffs in error combine and agree that no one of them will trade with any producer or wholesaler who shall sell to a consumer within the trade range of any of them, quite another case is presented. An act harmless when done by one may become a public wrong when done by many acting in concert, for it then takes on the form of a conspiracy, and may be prohibited or punished, if the result be hurtful to the public or to the individual against whom the concerted action is directed."

When the retailer goes beyond his personal right, and, conspiring and combining with others of like purpose, seeks to obstruct the free course of interstate trade and commerce and to unduly suppress competition by placing obnoxious wholesale dealers under the coercive influence of a condemnatory report circulated among others, actual or possible customers of the offenders, he exceeds his lawful rights, and such action brings him and those acting with him within the condemnation of the act of Congress, and the District Court was right in so holding. It follows that its decree must be

*Affirmed.*