WAGLEY v. COLONIAL BAKING COMPANY, et al.

In Banc. April 10, 1950.

No. 37441 (45 So. (2d) 717)

818

**Creekmore & Creekmore,** for appellants.

822

**T. J. Tubb,** and **Flowers, Brown & Burns,** for appellee, Golden Krust Bakery.

834

**Jackson, Young, Daniel & Mitchell,** for appellee, Hardin's Bakeries Corporation.

**Lotterhos & Dunn,** for appellee, Colonial Baking Company.

**Smith, J.**

Appellants are a co-partnership, doing business as Dixie Land Baking Company. Appellees, Colonial Bak-

ing Company and Hardin's Bakery Corporations, are corporations, while appellee, Golden Krust Bakery is a co-partnership. All, in May, 1948, were engaged in the bakery business in the City of Jackson. There was another so engaged at the same time, the Acme Bakery Company, not a party to the suit.

Appellants filed their declaration against appellees comprising two counts. The first count charged, in effect, three violations of Sections 1088 and 1089 of the Code of 1942, and demanded an award of $500 penalty for each violation. The violations allegedly consisted of concerted and simultaneous reduction of the wholesale price of white bread on June 15, 1948, from thirteen cents to twelve cents; on October 13, 1948, from twelve cents to ten cents; and on October 23, 1948, from ten cents to eight cents, all such reductions applying only within the City of Jackson, or close by, and only in the territory served by appellants. It was further charged that these reductions were the result of a combination and agreement among the appellees to reduce the price of such bread to a degree inimical to the public welfare, and for the purpose of stifling competition and monopolizing the production, control and sale thereof in the said City of Jackson and a limited zone outside of it.

Section 1088, Code 1942, defines a trust or combine as being a combination, contract, understanding or agreement, expressed or implied, between two or more persons, corporations, or firms or associations of persons or between any one or more of either with one or more of the others, within the purview of criminal jurisprudence, when inimical to public welfare and producing certain listed effects therein. Persons violating the statute are made subject to punishment and injunction against the further continuation thereof.

Section 1089, Code 1942, provides that "any corporation, domestic or foreign, or individual, partnership, or association of persons whatsoever, who, with intent to

accomplish the results herein prohibited or without such intent, shall accomplish the results to a degree inimical to public welfare, and shall thus: (a) Restrain or attempt to restrain the freedom of trade or production; (b) Or shall monopolize or attempt to monopolize the production, control or sale of any commodity, or the prosecution, management or control of any kind, class or description of business; . . . (d) Or shall destroy or attempt to destroy competition in the manufacture or sale of a commodity, by selling or offering the same for sale at a lower price at one place in the state than another''; such parties ''shall be deemed and held a trust and combine within the meaning and purpose of this section, and shall be liable to the pains, penalties, fines, forfeitures, judgments, and recoveries denounced against trusts and combines and shall be proceeded against in manner and form therein provided, as in case of other trusts and combines.''

Section 1092, Code 1942, authorizes any person, natural or artifical, injured or damaged by a trust and combine as defined, or by its effects directly or indirectly, to recover all damages of every kind sustained by him or it and in addition a penalty of five hundred dollars, by suit in any court of competent jurisdiction. It is also permitted by the statute for suit to be brought against one or more of the parties to the trust and combine and one or more of the officers and representatives of any corporation a party to the same, or one or more of either. Such penalty may be recovered in each instance of injury, and all recoveries provided for may be sued for in one suit.

Count II of the declaration charges that the price reductions, described in Count I, allegedly made by the defendants, were not for any legitimate purpose, but in furtherance of a joint and common scheme maliciously and wrongfully to interfere with appellants' business, destroying it and driving them into bankruptcy. It

was further charged that the aforesaid price reductions were not intended to benefit the public but to ruin appellants' business and coerce them into discontinuing their thirteen-inch loaf of bread. It is further asserted that when appellees had accomplished the purpose of their conspiracy they proposed to increase the price of bread back to its original cost to the public. Actual and punitive damages were demanded under Count II.

The appellees, each represented by different counsel, filed separate answers. It was denied, in detail, that there was any violation of the anti-trust statutes of this State, and that no common law rights of appellants had been by them transgressed. Price cuts were admitted, but, justified in appellees' pleadings, as having been made only for the purpose of meeting a competitive advantage obtained by appellants as a result of appellants' initiatory action, and to meet competition of the other baker in the City of Jackson. Denial was likewise made of any collusion, agreement or conspiracy by and between appellees, which interfered with or deprived appellants of any of their rights. The alleged "competitive advantage" to which allusion was made seems to be based on the premise that appellants gained it from their production and sale of a thirteen-inch loaf of bread in the City of Jackson for the same price charged by all three appellees for their eleven-inch loaf of bread in the same market.

At the end of appellants' testimony, appellees moved the court to exclude it and grant them a directed verdict, which was overruled. However, the court sustained appellees' motion, at the end of all of the evidence, for a peremptory instruction to find for the appellees, and such verdict was returned accordingly. Motion for new trial was made, overruled, and the plaintiffs below became appellants here, and the case is now before us for review.

Errors assigned, which we deem worthy of note are: 1. The granting of the peremptory instruction; 2. refusal of the trial court to permit appellants to introduce the Presidents of Hardin's Bakery Corporation and of Colonial Baking Company, defendants below, as adverse witnesses; 3. refusal to permit testimony of Mrs. Pucket, a witness for plaintiff below, recounting conversations with the sales manager of defendant, Hardin's Bakery Corporation; 4. refusal to allow plaintiff's witness, Wagster, to testify to a conversation with the general manager of Hardin's Bakery Corporation; 5. and refusal to allow various witnesses on behalf of plaintiff below, appellant here, to testify as to their telephone conversation with persons claiming to be the general manager or sales manager of defendant appellees; the court erred in refusing to allow various witnesses to testify ''of their telephone conversations with various persons claiming to be the general manager or sales manager of defendants.''

The record here is voluminous, consisting of two volumes, with the combined total of five hundred and forty-nine pages. Appellant has filed a lengthy brief, as have each of the attorneys representing the three several appellees; and the evidence is complicated and contradictory.

It is to be borne in mind that at the end of appellant-plaintiffs' evidence, the trial court overruled a motion by appellee-defendants to exclude it, and direct a verdict for them. But that at the end of all of the testimony, a motion for a peremptory instruction to the jury to find a verdict for the latter was sustained. This should not have been done unless the evidence of the movant overwhelmed by its weight, the proof of the opposite party. In considering this issue, there must be constantly borne in mind the rule that, on such a motion, ''the evidence must be treated as proving every fact favorable to appellant's case which it either proves or

tends to prove." Miller v. Bank of Holly Springs, 131 Miss. 55, 95 So. 129, 31 A. L. R. 698; and numerous others.

Both the basic statutes involved here, dealing with and defining trusts and combines, use the phraseology "inimical to public welfare." It becomes, therefore, necessary, in limine, to determine what is meant by that phrase, and what proof if any, must be produced to establish that a purpose or result is inimical to public welfare. It is laid down as a general rule that ██ █ " Where an anti-trust statute prohibits a specific thing, that fact, of course, furnishes a sufficient reason for condemning the particular combination and, as the state statutes generally go more into detail than the Federal statute, the state decisions are less controlled by general considerations. If a combination is within the express prohibition of the act, it constitutes no defense that the combination is not 'inimical to the public welfare,' although the statute uses this language, in describing the combinations thereby denounced. In such case, the words 'inimical to the public welfare' are not an added element of definition attached to each of the definitions already given in the separate sections of the statute, but the offense is complete when shown to come within the terms of any section, as thereby the legislature, in whom the discretion is vested, by its very declaration, determines the act to be inimical to the public welfare." 36 Am. Jur., Monopolies, Combinations, Etc., Section 133, Page 606. In Barataria Canning Company v. Joulian, 80 Miss. 555, 31 So. 961, this Court adopted the above language in its opinion.

Cited under that section is the Mississippi case of Retail Lumber Dealers' Association v. State, 95 Miss. 337, 48 So. 1021, 1023, 35 L. R. A., N. S., 1054, affirmed in Grenada Lumber Company et al. v. State of Mississippi, 217 U. S. 433, 30 S. Ct. 535, 54 L. Ed. 826. This Court said in its opinion: (differentiating between the rights of individuals to act as individuals, and their combined

action in unison to accomplish a common purpose) ■■■
"The individual right is radically different from the com-
bined action. The combination has hurtful powers and
influences not possessed by the individual. It threatens
and impairs rivalry in trade, covets control in prices, and
seeks and obtains its own advancement at the expense
and in the oppression of the public. . . . Any one of
several companies had the right to sell the whole or
only a part of its output to only such persons, in only
such territory, and at only such prices as it pleased; yet
it was inimical to the interest of the public and unlawful
for them to combine and agree that those matters should
be determined and controlled by an agency jointly
created for that purpose." It is true that the method
allegedly adopted to effectuate the charged combination
differs from the one described in the case quoted, the
same principle applies in each instance. In the Lumber
Company case, cited, this Court quoted with approval
this same language from American Jurisprudence and the
Barataria case, supra.

In affirming the Mississippi Court, the Supreme Court
of the United States held: that an act, harmless when
done by one, may become a public wrong when done by
many acting in concert, and when it becomes the object
of a conspiracy and operates in restraint of trade the
police power of the state may prohibit it without im-
pairing the liberty of contract protected by the Four-
teenth Amendment; and that, while an individual may
not be interfered with in regard to a fixed trade rule not
to purchase from competitors, a state may prohibit more
than one from entering into an agreement not to make
such purchases. The Court further declared that a
combination that is actually in restraint of trade under
a statute which is constitutional, is illegal whatever may
be the motive or necessity inducing it.

Quoting further from the aforesaid section of American
Jurisprudence, it is there declared: "The authorities

are generally agreed that if the necessary effect of the contract or combination is to stifle or directly or necessarily to restrict free competition or lessen it to an unreasonable extent, such contract or combination is under the ban of the law, whatever may have been the intention of the parties." Reference is made to Section 134, 36 Am. Jur., Monopolies, etc., page 607.

In a case involving Section 3 of the Anti-trust Act (Laws 1900, page 126, chap. 88) the Supreme Court of Mississippi, quoting from Yazoo & M. V. R. Co. v. Searles, 85 Miss. 520, 37 So. 939, 942, 68 L. R. A. 715, said "that the phrase 'inimical to the public welfare' was a legislative declaration that all the contracts condemned by this anti-trust statute were so 'inimical, were unlawful, and were a criminal conspiracy' ". The Court further declared that "it is not left to the courts to say that such contracts are inimical to the public welfare, but the Legislature itself has characterized such contracts as being inimical to the public welfare by this legislative declaration." Kosciusko Oil Mill & Fertilizer Company v. Wilson Cotton Oil Company, 90 Miss. 551, 43 So. 435, 437, 8 L. R. A., N. S., 1053.

In the case of United States v. E. C. Knight Company et al., 156 U. S. 16, 15 S. Ct. 249, 39 L. Ed. 325, that Court held: Again all the authorities agree that in order to vitiate a contract or combination, it is not required that its result should be a complete monopoly. It is sufficient if it really tends to that end and to deprive the public of the advantages that flow from free competition. See also Yazoo & Mississippi Valley Railroad Company v. Searles, 85 Miss. 520, 525, 37 So. 939, 68 L. R. A. 715; Harvey v. State ex rel. Knox, Atty. General, 149 Miss. 874, 116 So. 98; Standard Oil Company of Kentucky v. State, ex rel., Atty. General, 107 Miss. 377, 65 So. 468.

██ So, it is to be deduced from the foregoing authorities that the Legislature has declared the forbid-

den things, listed in the statute, to be inimical to the public welfare, and, therefore, if proof be sufficiently made of a transgression of the statutory prohibitions, such act is intrinsically inimical to the public welfare without further or special proof of a result beyond the definitions of the statutes, or deduction by the courts that proven violations are or are not inimical to public welfare. The Legislature has pre-empted the question.

As to proof of conspiracy, with which the second count of the declaration deals, the rule as to the nature and character of the evidence to be adduced as proof of an unlawful combine or conspiracy, the general rule is set forth in 15 Corpus Juris Secundum, Conspiracy, Section 29; and 5 R. C. L., Conspiracy, Sections 37, 39.

In dealing with alleged violation of the Sherman Anti-Trust Laws, the Supreme Court of the United States said: "But it is said that in order to show a combination or conspiracy within the Sherman act some agreement must be shown under which concerted action is taken. It is elementary, however, that conspiracies are seldom capable of proof by direct testimony, and may be inferred from the things actually done; and when, in this case, by concerted action the names of wholesalers who were reported as having made sales to consumers were periodically reported to the other members of the associations, the conspiracy to accomplish that which was the natural consequence of such action may be readily inferred." Eastern States Retail Lumber Dealers' Association, et al. v. United States, 234 U. S. 600, 34 S. Ct. 951, 954, 58 L. Ed. 1490, L. R. A. 1915A, 788.

We think the case of Memphis Steam Laundry-Cleaners, Inc., v. Lindsey, 192 Miss. 224, 5 So. (2d) 227, is very much in point here. It is, however, the only case we can find where proof was made by evidence of express threats. Yet, the principle itself is applicable here, even if express threats against appellants be not proven, if the circumstantial evidence be sufficient to establish a

like purpose. In that case we held that ██ the reduction of prices is an absolute right of the owner of a business and is lawful of itself, but under the guise of exercising an absolute right, it is not lawful indirectly to interfere with the business, employment, or occupation of a third person, where the exercise of the right was with the object of injuring the third person rather than primarily of benefitting the person exercising the right. The Lindsey case, it is true, was a common law action for unfair competition, while the second count of the case at bar is a common law action for conspiracy, but they are analogous enough to draw from similar principles.

Without deciding the issue of fact ourselves, we are of the opinion also that the trial judge should not have decided it, but should have left it to the jury. To set out all of the evidence in this voluminous record would require a book. We will merely suggest some of the principal factual issues: (1) whether or not the defendants conspired unlawfully to stifle trade, interfere with, or drive appellants out of their trade territory in the City of Jackson, or whether their action was merely in lawful competition with Acme Bakery; (2) were the three reductions in prices of bread in the City of Jackson made simultaneously, or approximately so, and part of a conspiracy against appellants, or in violation of the anti-trust statutes, or if the incidence of closely timed reductions was a mere coincidence? (3) whether the visit of North and his manager, on the occasion of the resumption of the baking business in Jackson by appellants, was part of a general design to interfere unlawfully with their doing so, and a part of a common scheme of all three defendants; (4) whether the contributions of eleven-inch pans by all defendants synchronously, at the time appellants were making a thirteen-inch loaf, and never had made any other, and all appellants were making an eleven-inch loaf, was a part of a concerted plot under the statute,

against appellants; (5) whether, when appellants went back to the thirteen-inch loaf, all three appellees twice and simultaneously put sealettes on their loaves, fixing the retail price of the same, this was a furtherance of a united purpose against appellants, as alleged in their declaration; (6) whether the fact that the two corporate defendants put out a thirteen-inch loaf and all three still retained their eleven-inch loaf at cut prices, was an element in a combined purpose to contravene the statute, to the unlawful hurt and injury of appellants; (7) whether or not, the reduction of the bread price of the three appellees only in the City of Jackson, and only where appellants operated, and not outside, where appellants did not operate, was a fact under the statute; (8) whether, the successive reductions of their bread in the City of Jackson alone by all three appellees from thirteen cents to twelve cents, from twelve cents to ten cents, and from ten cents to eight cents, the latter being below the cost of production, was a fact and brought the defendants within the condemnation of the statute, or whether it was aimed at Acme alone; (9) whether or not the three appellees conferred with each other as to the consecutive steps suggested from the evidence, in the foregoing, and refrained from conferring with appellants, was such conduct as resulted in doing the thing prohibited by the statute; whether all of the three appellees raised the price of their bread back to its original cost to the consumer on the same day, upon the filing of this action against them, and why; (10) whether appellees were only trying lawfully to meet the competition of Acme, or seeking to destroy appellants' business, or illegally interfere with free trade, reduce the price or production of bread, as against the statutes; (11) or as a matter of fact violated any of the charged statutory provisions; and (12) whether or not an allegedly unlawful conspiracy was entered into against appellants, as charged in the declaration. We are not precluding any other issues inadvertently omitted from the foregoing.

 Appellants had just resumed their business in Jackson when these appellees began the series of events culminating in this suit. Their production had reached about one thousand loaves per day, but Mr. Wagley was apparently conducting a vigorous advertising campaign, and the business was growing with their thirteen-inch loaf on the market, the only sort they had ever made or for which they had the pans. Thereupon, the activities of appellees sprang into being, or at least we think the jury should be permitted to say whether they did, or were precipitated by a course of dealing by Acme. Frankly, from the record, Acme's competition seems rather negligible, and the jury should have the right to consider its small production against the very large production of the three defendants, in reaching a verdict in this case.

It seems improbable that it was against Acme, but more probable that it was in concert with Acme, whose manager testified that never before in all the long history of that bakery had it cut prices of bread, and yet, here the three defendants, at approximately the same time, ultimately cut the price of bread to eight cents, admittedly below the cost of production, and admittedly leading to bankruptcy if long followed. Or the jury would be justified in so finding. Appellants did not and could not meet this cut. They had eight hundred and forty loaves returned to them by the retailers in a single day, and their sales suffered a heavy decrease throughout the period. It is not disputed in the record, as we see it, that appellees, all three of them, at a time when all three were operating both in and out of Jackson, wherein only appellants were operating, all fixed the price of bread in Jackson at a price lower than their price for the same bread outside the city limits. With this, Subsection (d), Section 1089, Code 1942, specifically deals, as follows: "Or shall destroy or attempt to destroy competition in the manufacture or sale of a com-

modity, by selling or offering the same for sale at a lower price at one place in the state than another . . .". Or, at least, a jury could so find.

We are of the opinion, as stated supra, that the lower court committed reversible error in granting appellees the peremptory instruction, and remand it for a new trial.

Complaint is also made of other actions of the trial court to the alleged prejudice of appellants.

Appellants offered the Presidents of defendant corporations, Hardin and Colonial, as adverse witnesses, but the court would not permit them to be cross-examined as adverse witnesses, at the objection of appellees. Appellants then asked to examine them in the absence of the jury, so as to make a record, which was also denied. Later, but not before the jury, appellants were permitted to state in the record what they expected to prove by three executives, to which appellees fling the charge that it was merely a repetition of the declaration in the case. The court, during the trial, permitted these same two presidents of defendant corporations to remain in the courtroom as advisers to the attorneys for the defendant-appellees.

Appellees seek to justify this denial of such cross-examination under the statute, Section 1710, Code 1942, which reads in part: "A party to a suit desiring to examine any opposite party in open court, may, without first taking his deposition, have such party subpoenaed as a witness and examine him in the presence of the court . . . and shall be at liberty to contradict the testimony of such party . . .". It is contended that the presidents of the corporate defendants were not opposite parties in this case, although their corporations were parties, and hence appellees contend that the trial court was correct in this ruling. They cite a Massachusetts case which seems to lend them encouragement. Reed v. Mattapan Deposit & Trust Company, 198 Mass.

306, 84 N. E. 469. However, the witness was an actuary, and not a president, although an officer of the company. We think this was error. We believe that a justified parity of reasoning brings the point within the conclusion of this Court in the case of Illinois Central Railroad Company v. Sanford, 75 Miss. 862, 23 So. 355, 942, dealing with interrogatories addressed to non-resident defendants, wherein we said: ''If the testimony of a party to a suit who resides out of the state, . . .'' etc. In that case, it was declared: ''We are of the opinion that Section 1761 (Code 1892) applies to and includes corporations. It seems natural and reasonable to suppose that that section should apply in favor of all litigants, and against all parties to a suit, whether such parties be natural or artificial persons. It is obvious that a corporation cannot deliver testimony in person, and may not therefore literally comply with the statute, yet the business of corporations is conducted by the agency of officers intrusted with duties assigned them, as president, manager, or heads of department, etc., and these officers or heads of department may well speak for the corporation in matters confined to their management.'' We think the same reasoning applies here to charge the trial court with error in refusing to permit appellants to introduce the presidents of the two defendant corporations as adverse witnesses.

It was also contended by appellees that even if this were error, it was harmless at least as to one of such presidents, whom appellees introduced, and he was cross-examined by appellants' counsel. We do not think this is a successful answer. He had sat in the courtroom, and by that time, had become a thoroughly informed witness, and the harm had already been done to appellants.

It is interesting in this connection to ponder what was said in Reed et al. v. Charping, Miss., 41 So. (2d) 11, 13: ''While appellee made a gesture at denial of his representations, he contradicted himself on numerous

points in his testimony, there being a substantial variance between what he said when unexpectedly called as an adverse witness for cross-examination and what he later said on direct examination as a witness in his own behalf.'' In other words, appellants had lost this advantage of surprise, when this witness was later introduced by appellees.

We do not think the authorities cited by appellees justified the trial court in this regard. Illinois Central R. Co. v. Sanford, supra. Section 1711, Code 1942, uses the language, ''a party or other interested witness.'' Under Section 1712, dealing with depositions of nonresident parties, where interrogatories are addressed to a defendant corporation, such interrogatories would have to be answered by an officer of the corporation. Compare Cumberland Tel. & Tel. Co. v. State, 98 Miss. 159, 53 So. 489. In the Memphis Steam Laundry-Cleaners case, supra, we held that the motives or malice of the officers of defendant corporation, while they are engaged in carrying out their policy of trying to destroy plaintiff's business, were the motives or malice of the corporation itself since it could only act through them in determining upon and carrying out such a policy. We have concluded the trial court committed prejudicial error here, for which the case must be reversed and remanded.

 One of the assignments of error is that Mrs. Pucket was refused permission to testify, as a witness for appellants, to her conversation with the sales manager of defendant, Hardin's Bakery. She was a dealer in bread outside of Jackson, who was not getting the benefit of price reductions in the City of Jackson, and when she protested, Hardin's manager came to see her, but the court, at the instance of appellees, refused to let her relate what he said. We think this was error.

 We are also of the opinion that the court erred in refusing to let certain witnesses of appellees repeat telephone conversations allegedly had with managers and

authoritative employees of appellees, when the parties were so called by the witnesses, and purportedly answered in the characters in which they were called. This created a rebuttable presumption that they were what they represented themselves to be, and this evidence in our judgment was admissible, and the court erred in not admitting it. 20 Am. Jur., Evidence, Section 367, page 335.

It was likewise error to sustain objections to certain questions propounded to certain officers and employees of the various defendants, on the ground that they could speak only for themselves and their companies, and not for their co-defendants, by their testimony. They were all charged with the joint violation of the anti-trust statutes and with seeking a common end, and with conspiracy. The court below by overruling the motion to exclude and grant appellees a directed verdict, as stated supra, had thereby certified appellants had made out a prima facie case. Their testimony was relevant to the issue, and should have been admitted, we think as against all, for the reason that it necessarily involved all of the defendants, and its purpose was to tie all defendants together. This, too, we think was reversible error. ''One conspirator, although uncorroborated, is a competent witness against a co-conspirator.'' 15 C. J. S., Conspiracy, Section 29, p. 1043. This section further says: ''The law permits great latitude in the admission of circumstantial evidence tending to establish a conspiracy, and to connect those advising, encouraging, aiding, abetting, and ratifying the overt acts committed for the purpose of carrying into effect the objects of the conspiracy, as the jury should have before them and are entitled to consider every fact which has a bearing on and a tendency to prove the ultimate fact in issue and which will enable them to come to a satisfactory conclusion.''

By the rulings of the court in connection with the last four assignments of error, the trial court prevented appellants from fully and adequately developing their case, which they should not be prevented from so doing on a retrial thereof before a jury. We have meticulously considered the entire record and case, and have devoted most careful attention to all of the excellent briefs, on both sides. We have reached our conclusion only after so doing.

The case will be, and is, reversed and remanded for a new trial before a jury.

Reversed and remanded.

**Roberds, J.**, dissenting.

This, in my view, in the last analysis, is nothing but a price-war between private enterprises selling the same commodity—one type of war, at least, of benefit to the public, and one permitted to private institutions under our supposedly competitive form of free government. And appellants started the war. It is not the first time in history that the aggressor has been the loser in the end. In any event, it is not to me a case calling for and justifying the use of the power and processes of the courts in the punishment of competitors who were defending themselves, and engaged in the reduction of prices to the public, a result certainly not undesirable at the present time.