(89 Misc. Rep. 501)

### AUBURN DRAYING CO. v. WARDELL et al.

(Supreme Court, Equity Term, Cayuga County.   March 30, 1915.)

INJUNCTION ⬤═➣104—PERSONAL RIGHTS—PEACEABLE BOYCOTT.

Plaintiff, a draying company, left its employés free to become union men, and did not refuse to treat with union labor, or discriminate against its union employés; but its manager refused to exert pressure on them to join a union, and part of them remained out of it, whereupon a central union, supported by local unions, declared plaintiff to be "unfair," and, without misstatement of facts, began a special peaceable boycott by notifying plaintiff's customers, contractors, meat cutters, bakers, etc., that their men would quit or strike if they continued to patronize plaintiff, and threatened a continuance of such boycott, in consequence of which plaintiff had to abandon a contract to haul material for a contractor, and lost other patronage.   Penal Law (Consol. Laws, c. 40) § 580, provides that if two or more persons conspire (subdivision 5) to prevent another from exercising a lawful trade by threats or intimidation, or (subdivision 6) to commit any act injurious to trade or commerce, each of them shall be guilty of a misdemeanor.   Held, that defendant's acts and threats violated the statute, and entitled plaintiff to an injunction against the enforcement of resolutions or orders of defendant unions requiring their members to quit the service of employers patronizing plaintiff, the giving of notices to such employés, or to the public, of an intention to quit, and any other attempt or threat to use their powers over their members to induce or compel plaintiff's patrons or the public generally to refrain from dealing with plaintiff, and to damages.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. § 177;  Dec. Dig. ⬤═➣104.]

Action for an injunction and damages by the Auburn Draying Company against William Wardell, individually and as business agent, etc., Frank S. Tippett, individually and as secretary, etc., and George Reichnecker, individually and as president, etc., and others.   Permanent injunction granted.

Walter Gordon Merritt, of New York City, and George B. Turner and John Taber, both of Auburn, for plaintiff.

Frederick A. Mohr, of Auburn, and Frank Hopkins, of Syracuse, for defendants.

SUTHERLAND, J.   This action is brought to restrain the prosecution of a boycott declared against plaintiff's business, and for damages sustained.

The plaintiff, when the trouble arose, was the leading concern engaged in the trucking business in the city of Auburn, and had many regular patrons engaged in trade and commerce in that city, who had customarily employed the plaintiff, and were pleased with the service rendered, and were disposed to continue their patronage.   The normal commercial life of that city was so related by habit and usage to the business of plaintiff as a going concern that to summarily suppress its participation in the transportation of commodities would not only destroy the business of the plaintiff, but would, at the same time, work an appreciable injury to the trade and commerce of that community.

Harmonious relations had always existed between the plaintiff and

its employés, from 30 to 45 in number. They had been free to become union men or not, as they chose, so far as plaintiff was concerned, and they did not join in any movement or agitation against the plaintiff. As a whole they were apparently satisfied with the terms and conditions of their employment. The agitation was started by persons not related in any way to plaintiff's working force, who represented the Teamsters' Union and the Central Labor Union, and endeavored unsuccessfully to persuade plaintiff's employés to join the local Teamsters' Union, which was organized in November, 1912. These representatives and their organizations appear to have taken offense because, when the men did not come in voluntarily in response to such effort, the plaintiff, when requested by the labor leaders to advise or compel its men to join, declined so to do.

Thereupon a thoroughgoing boycott was organized by the leading men in labor union circles in Auburn against the plaintiff. The initial action by the unions, as such, was taken by the Teamsters' Union, which passed a resolution at a meeting in July, 1913, declaring the Auburn Draying Company to be "unfair." Two lumber companies were placed on the unfair list at the same time, but they do not seem to have figured extensively in the propaganda which followed. The Central Labor Union then took the matter up, and after unsuccessful negotiations with plaintiff the declaration of unfairness was approved by the Central organization, and action was also taken by the meat cutters and bakers and other local organizations sustaining the attitude of the Teamsters' Union and the Central Labor Union toward the plaintiff, and a systematic, concerted campaign was undertaken to compel plaintiff's customers to stop patronizing plaintiff by threatening to call strikes among their own men if such patronage were continued.

Union labor in Auburn was efficiently organized, in the sense that the various local unions were bound together through their representatives in the Central Labor Union, which was nominally an advisory body, but in fact exercised a direction and control which made the entire union movement cohesive, well-disciplined, and powerful for any purpose for which such a movement may be utilized. Disobedience by their members to the orders of the local unions could be punished by fine or expulsion, and disobedience to the directions of the Central Labor Union on the part of a local union could be punished by its excommunication from the central body. When employed for legitimate ends, great good would result from such extensive and efficient co-operation; but in this particular case, when the energies of the entire organization were directed against the plaintiff in an effort to drive away its customers, the result was certain to be disastrous to the plaintiff, just as it was intended to be by the promoters of the boycott.

Plaintiff's customers were notified that the plaintiff was on the unfair list, and were told that the union men in the employ of said customers would quit if the customers continued to patronize the plaintiff. A contractor erecting a theater had employed plaintiff to haul the iron work from the railway station to the place where the building was going up, and derricks and hoisting apparatus had been placed

in position by the plaintiff to facilitate its work, when the contractor was told by the agents of the unions that the different workmen of the various organizations there employed would be called off from the job if the plaintiff drew the material. The plaintiff not only had to abandon its engagement, but had to haul the material which it had drawn to the job back to the railway station, from which point it was again hauled to the theater by another trucking company, not in disfavor with the unions, in order to avoid a strike being called on the contractor.

Other building contractors were informed by the union agents that they would have to substitute some one else to haul their materials or said agents would take the union men off the jobs. The butchers were notified by such agents that union meat cutters would quit if beef was hauled to the markets by the plaintiff's trucks. The bakers were likewise notified; and one of them testifies that he asked his men about it, and they said they would be fined if they continued to work with materials hauled by the plaintiff. Merchants, whose clerks belonged to union organizations, on receiving similar notices, succumbed at once and withdrew their patronage, for fear their clerks would quit if the Auburn Draying Company were to continue to haul merchandise to their stores. This continued until a temporary injunction was granted against the continuation of the boycott, whereupon some, at least, of the former customers resumed the habit of employing the plaintiff, which had been interrupted by the threats and demands of the defendant organizations and their leaders.

There has been, during the entire trouble, no force or violence used or threatened. There has been no misstatement of facts, unless the use of the word "unfair," when applied to the plaintiff, may have been misleading; and it is not charged that there was any intention to misrepresent the facts in this respect. It may not be very important, except as the fact may show that the movement against plaintiff was specially conceived, and was not merely incidental to a general, well-defined policy, that there does not seem to be in the constitution or laws of these organizations any authoritative interpretation of the word "unfair." At the trial, in order to obtain an accurate conception of the meaning of that word from the standpoint of well-informed members of the union, one of the leading members of the central organization was interrogated as follows:

"Q. Mr. Dennis, do you know of any authoritative definition by any convention, or any rules of the labor union, of the word 'unfair'? A. I don't know that we have got any. It is generally assumed that a man that refuses to treat with the labor organizations, refuses to employ union labor and give to his employés the conditions asked for by labor organizations, is unfair, or not friendly, to the organizations. He is not unfair until after a declaration made by the organization. Q. You specify certain things: Refusal to treat with the representatives of the organization, and refusal to give his men the conditions provided by the labor organizations. I suppose you mean working conditions, shop conditions, hours, etc.? A. Yes, sir. Q. What was the other particular? A. Refusal to employ members of the organization. Q. I was trying to find out yesterday whether there was any statement which could be considered as authoritative, defining the conception of the labor union men of the word 'unfair'? A. That I believe is the general understanding of it."

Mr. Nugent, another well-informed member, gave the following upon that point:

"Q. What is your definition of 'unfair'? A. Why, any firm that refuses to treat or deal with organized labor, or affiliated unions, is unfair to organized labor. That is the way we always put it. Q. What do you mean by refusing to deal or treat with organized labor or the representatives? A. Won't hire union men, or won't meet any officer from the union to treat with them. Q. Does your definition of 'unfair' necessarily include every man who maintains what might be called an open shop, employing union men and nonunion men? A. No; that is not an unfair firm; an unfair firm is a firm that does not employ union men. Q. That discriminates against union men and declines to employ them? A. Yes, sir."

The plaintiff did not refuse to treat with union labor leaders, nor did it discriminate against those of its employés who did belong to that organization. Some effort was made at the trial to show that union men were discriminated against; but that claim is not justified by the facts. It is true Mr. Wilson, the manager of the plaintiff, stated to the union leaders who called upon him that, if his men asked his advice as to joining the union, he would tell them that he thought it would not tend to preserve the spirit of harmony which had existed between the men and their employers, but might introduce an element of discord. He stated that he would not volunteer this information, and would put no obstacle in the way of any of his men joining who desired; but it is not unlikely that his unsympathetic attitude toward the union idea was understood by his employés. Mr. Wilson testifies that Mr. Dennis, who was the official organizer of the American Federation of Labor, business agent of the Central Labor Union at Auburn, and ex officio agent of each affiliated local union, told him, if the men would not join, he (Wilson) must discharge them. This Dennis denies. But the efforts of Dennis with the men had proved unavailing, and he undoubtedly tried to get Wilson to bring pressure upon the men to join; and because Wilson did not do as he requested, and because the men continued to remain out of the union, the plaintiff was declared unfair. Some of the plaintiff's employés offered to join, but after the declaration of unfairness the union would not receive a portion of the men and permit them to work with others who did not belong to the union; the position of the union being that they would then take all of the plaintiff's men into their organization or none.

It is plain enough that, whether the words used in notifying plaintiff's customers that labor troubles would come to them if they continued to patronize plaintiff were that the union men would quit, or would be *ordered* to quit, the intention was disclosed to use the power of the labor organization, if necessary, to compel the members to quit; and what was feared by the customers was, not any voluntary, self-initiated movement of their own employés to quit, but that they would quit because ordered to do so by the organizations to which they belonged, which possessed disciplinary powers to enforce obedience. The temporary injunction continued until the case was tried upon the merits; and it must now be determined whether a cause of action in equity exists, and, if a permanent injunction is to issue, toward what acts it should rightfully be directed.

The law on the subject of the peaceful boycott does not seem to have been so clearly settled in this state by its court of last resort as to leave no ground for uncertainty. The familiar and frequently cited cases of Curran v. Galen, 152 N. Y. 33, 46 N. E. 297, 37 L. R. A. 802, 57 Am. St. Rep. 496, Nat. Protective Ass'n v. Cumming, 170 N. Y. 315, 63 N. E. 369, 58 L. R. A. 135, 88 Am. St. Rep. 648, and Jacobs v. Cohen, 183 N. Y. 207, 76 N. E. 5, 2 L. R. A. (N. S.) 292, 111 Am. St. Rep. 730, 5 Ann. Cas. 280, if they are entirely reconcilable, do not apply so closely to the question at issue here as to dispose of it, and I think it may be regarded as still an open question as far as the Court of Appeals is concerned; and the reported opinions of judges of other courts of this state are not in entire harmony in all their expressions as to the legal effect of a combination or agreement of many to do that which each individual of his own accord might lawfully do as to the withholding of patronage, where no physical interference is used or threatened, and no misstatement of fact employed to arouse hostility. It has sometimes been said that if the purpose of the confederated movement is to benefit the members of the organization, and the consequent injury to a third party only an incident, the injury is without legal redress in the civil courts. See review of New York cases in Gill Engraving Co. v. Doerr et al. (D. C.) 214 Fed. 111. Whether that be the true test is, to say the least, open to great doubt; and I venture to suggest that it will be hard to find a case in the books where a combination has been held to be illegal, and has been restrained from operating, in which the purpose of the combination was not to benefit its members. The acts done to accomplish the purposes of the organization may bring it under condemnation, and render it liable in damages to the party injured by said acts, even if the purpose for which the organization was formed is most praiseworthy. The distinction between motive and intent, between ultimate purpose and immediate purpose, must not be forgotten.

In so far as it may be thought to be material to inquire whether the movement against the plaintiff was merely incidental to a general policy adopted by the unions, irrespective of the individuals outside their organization who might happen to gain or lose by it, it is clear that the declaration of unfairness against the plaintiff was not so made. The resolution of unfairness and the propaganda which followed were rather in the nature of special legislation and special action directed particularly against the plaintiff, for the immediate purpose of destroying its business unless it would yield to the demands imposed upon it and take the necessary steps to bring its unwilling employés into the union.

The immediate purpose and intent, and not the ultimate purpose or hope, of the defendants in instituting the boycott should be considered, if the purpose of those who inaugurate a boycott bears upon its legality. While the ultimate hope of the defendants no doubt was to better the condition of the members of the union by bringing into it all the craftsmen and laborers in Auburn, so that their united efforts for higher wages, shorter hours, and better working conditions might be more persuasive and effectual, and assuming, as we readily may, that without such motive or ultimate purpose the boycott would not have been inaugurated, nevertheless the immediate business in hand, the specific and direct thing which the defendants were then and there devoting

their energies to and focussing all of the disciplined power of their organization upon, by which their intent in the true legal sense is to be ascertained, was the destruction of the plaintiff's business, in order that the plaintiff, through its sufferings, might be forced to yield to the demands of the union; and by this immediate purpose and intent the legality of the boycott movement in this case should be determined. What was threatened, intended, and in part accomplished, was injury to the business and property of the plaintiff; the acts performed and results accomplished being also necessarily injurious to trade and commerce. Whether we call those acts means or ends, they are forbidden under the statutes of this state. Penal Law, § 580, subds. 5, 6; People ex rel. Gill v. Smith, 5 N. Y. Cr. R. 509, affirmed 15 N. Y. St. Rep. 17; Id., 110 N. Y. 633, 17 N. E. 871; People v. Davis, 159 App. Div. 464, 144 N. Y. Supp. 284.

The sections of the Penal Law relating to conspiracy have received much attention in the arguments and briefs of the learned counsel who have presented the case and the defense with very great ability. Section 580, as far as it relates to the subject under discussion, provides that:

"If two or more persons conspire: * * *

"5. To prevent another from exercising a lawful trade or calling, or doing any other lawful act, by force, threats, intimidation, or by interfering or threatening to interfere with tools, implements, or property belonging to or used by another, or with the use or employment thereof; or

"6. To commit any act injurious to the public health, to public morals, or to trade or commerce, or for the perversion or obstruction of justice, or of the due administration of the laws,

"Each of them is guilty of a misdemeanor."

Section 582 reads as follows:

"No conspiracy is punishable criminally unless it is one of those enumerated in the last two sections, and the orderly and peaceable assembling or co-operation of persons employed in any calling, trade or handicraft for the purpose of obtaining an advance in the rate of wages or compensation, or of maintaining such rate, is not a conspiracy."

Speaking first as to the declaration in section 582 that co-operation to obtain an advance of wages, or to maintain the rate, is not a conspiracy, it is clear that that proviso is not applicable to this case, because the bone of contention here was not wages, but the open shop. The facts here are not unlike those discussed by Mr. Justice Barrett in People ex rel. Gill v. Smith, 5 N. Y. Cr. R. 509; and the reasoning in that case is equally persuasive to show that section 582 does not furnish immunity to these defendants for the acts complained of.

It seems to be necessary under the evidence to hold that the confederated acts of the defendants violate section 580, above quoted, as being injurious to trade and commerce, and also that the threats to call strikes on plaintiff's patrons to prevent the plaintiff from exercising its lawful trade or calling were illegal under the penal statute above quoted. As to the threats, it is argued that each member of the union has the unchallenged legal right to quit his job, and that a threat to do that which the persons making it have a perfect right to do is not the kind of a threat referred to in subdivision 5 of section 580; and I accept that contention as sound. But it seems to me clear that what one may

do as an individual, and may therefore threaten to do, lawfully, with respect to withdrawal of his own patronage, cannot always be done nor threatened to be done lawfully by a combination of individuals held together in a compact to act unitedly in that respect. If the making and observance of the compact by many confederates is calculated to injure trade and commerce, it is obnoxious to the common law, and a threat to do that is a threat to do an unlawful act.

In two recent cases the Appellate Division of the Second Department in this state has affirmed decisions of the Special Term granting injunctions against the prosecution of boycotts by labor organizations, and the conclusions therein reached with regard to the propriety and form of an injunction may be employed here. Newton Co. v. Erickson, 70 Misc. Rep. 292, 126 N. Y. Supp. 949, affirmed 144 App. Div. 939, 129 N. Y. Supp. 1111; Bossert v. Dhuy, 151 N. Y. Supp. 877.

Some of the recent decisions of the Supreme Court of the United States with regard to the legal impropriety of combinations to withhold patronage and confederated movements to boycott have a bearing upon the present case, although they arose under the Sherman Anti-Trust Act (Act July 2, 1890, c. 647, 26 Stat. 209); for, contrary to what was generally supposed to be the more inclusive interpretation made in previous decisions, it seems to be held in the Standard Oil Co. Case, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734, and the American Tobacco Co. Case, 221 U. S. 106 (see page 179), 31 Sup. Ct. 632, 55 L. Ed. 663, that the words "restraint of trade," used in the act of Congress, were intended to and do have only the significance which they had at common law and in the law of this country at the time of the adoption of the Anti-Trust Act, and—

"only embraced acts or contracts or agreements or combinations which operated to the prejudice of the public interests by unduly restricting competition, or unduly obstructing the due course of trade, or which, either because of their inherent nature or effect, or because of the evident purpose of the acts, etc., injuriously restrained trade."

In the light of the latest interpretation of the Sherman Act thus given, what that court say, when dealing with boycotts under that act, becomes very instructive, also, as an exposition of the legality or illegality of similar agreements and acts at common law.

In Eastern States Retail Lumber Dealers' Ass'n v. United States et al., 234 U. S. 600, at page 614, 34 Sup. Ct. 951, at page 955 (58 L. Ed. 1490), the court say:

"A retail dealer has the unquestioned right to stop dealing with a wholesaler for reasons sufficient to himself, and may do so because he thinks such dealer is acting unfairly in trying to undermine his trade. 'But,' as was said by Mr. Justice Lurton, speaking for the court in Grenada Lumber Co. v. Mississippi, 217 U. S. 433, 30 Sup. Ct. 535, 54 L. Ed. 826, 'when the plaintiffs in error combine and agree that no one of them will trade with any producer or wholesaler who shall sell to a consumer within the trade range of any of them, quite another case is presented. An act harmless when done by one may become a public wrong when done by many acting in concert, for it then takes on the form of a conspiracy, and may be prohibited or punished, if the result be hurtful to the public or to the individual against whom the concerted action is directed.' "

The lumber dealers in the case just cited, whose agreement not to patronize wholesalers who sold at retail in their territory was declared illegal, certainly had an interest of their own which they were trying to promote by that agreement; but that interest did not furnish them immunity. The combination there operated primarily, of course, as a restraint upon the purchasing trade of the parties to the contract. In the case at bar, the patronage of third persons, not parties to the compact, was sought to be cut off from the plaintiff. In that respect the present case is more like the boycotts against the Buck's Stove & Range Company and the Danbury hat manufacturers, which were held to be illegal. Gompers v. Buck's Stove & Range Co., 221 U. S. 418, 31 Sup. Ct. 492, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874; Loewe v. Lawlor, 208 U. S. 288, 28 Sup. Ct. 301, 52 L. Ed. 488, 13 Ann. Cas. 815; Lawlor v. Loewe, 235 U. S. 522, 35 Sup. Ct. 170, 59 L. Ed. ——, opinion handed down January 5, 1915.

In Gompers v. Buck's Stove & Range Co., supra, the court say of labor unions as follows (221 U. S. at page 439, 31 Sup. Ct. at page 497, 55 L. Ed. 797, 34 L. R. A. [N. S.] 874):

"The law, therefore, recognizes the right of workingmen to unite and to invite others to join their ranks, thereby making available the strength, influence, and power that come from such association. By virtue of this right, powerful labor unions have been organized. But the very fact that it is lawful to form these bodies, with multitudes of members, means that they have thereby acquired a vast power, in the presence of which the individual may be helpless. This power, when unlawfully used against one, cannot be met, except by his purchasing peace at the cost of submitting to terms which involve the sacrifice of rights protected by the Constitution, or by standing on such rights and appealing to the preventive powers of a court of equity. When such appeal is made, it is the duty of government to protect the one against the many as well as the many against the one."

The plaintiff is entitled upon the facts established to damages and an injunction against the continuation of the injurious acts. By stipulation, the assessment of damages, if the right to damages is upheld, is to be taken up on a supplemental hearing. The form of the final injunction to be granted should not be so broad as to withhold from any individual member of any of the unions the right to quit his job at any time according to his own pleasure, and to consult with his fellow members in that regard. And when we speak of an agreement to quit work, or not to patronize, as being under some circumstances unlawful, it should be understood that by agreement we mean a compact or mutual understanding which imposes something in the nature of an obligation on the parties thereto, and not to an agreement in the sense in which that word is used to denote mere similarity or harmony of opinion or belief which may be entertained by a number of individuals who, as the natural result of the holding of such similar views, may find themselves moving in the same direction at the same time; each individual doing of his own volition just what others around him are doing for the same reason, without any understanding or promise that they shall act together, which state of mind and consequent simultaneous action is surely not subject to control by law, nor justly called a conspiracy. There is a very perceptible and practical difference between the latter supposititious condition and the one pre-

sented in this case; and I venture the opinion that the full liberty of every individual to act according to his own will with regard to withholding his own labor or patronage will be preserved, and the plaintiff will be also protected from unjust and unlawful injury, if what may be compulsory action on the part of the members of the union, because of the disciplinary powers possessed by the organization over its members, or because of the obligatory nature of the compact entered into by the group, is enjoined.

The injunction, broadly speaking, should prohibit the enforcement of resolutions, rules, or orders of the defendant unions requiring their members to quit the service of employers who patronize the plaintiff, and the giving of notices by or on behalf of said organizations or the officers thereof to such employers, or the public, of an intention to quit provided said employers continue to patronize the plaintiff, and any other attempt or threat to use the powers or authority of the defendant unions over their own members, for the purpose of inducing or compelling patrons of the plaintiff, or the public generally, against their will, to refrain from dealing with the plaintiff.