## UNITED STATES GYPSUM CO. v. HESLOP et al.

### No. 171.

District Court, N. D. Iowa, Central Division.
March 25, 1930.

Helsell, McCall & Dolliver, of Ft. Dodge, Iowa, and Scott, Bancroft, Martin & MacLeish, of Chicago, Ill., for plaintiff.

John M. Schaupp, Jr., of Ft. Dodge, Iowa, for defendants.

SCOTT, District Judge.

A suit in equity by United States Gypsum Company, an Illinois corporation, against John Heslop, Fred W. Knigge, John Maddox, William Carlson, Joseph Hayes, E. D. Russell, Gypsum Mill Workers' Union No. 141, and Gypsum Miners' Union No. 158, citizens of Iowa and residents of Ft. Dodge in said state, for an injunction restraining defendants from conspiring together to injure plaintiff's interstate business and to prevent plaintiff from operating its mine and mill at Ft. Dodge, Iowa, on an open shop basis; from publishing and circulating printed and written statements to the effect that plaintiff is or has been declared unfair to organized labor, and that a strike originating in 1921 at plaintiff's mill at Ft. Dodge is still in force; that plaintiff employs convict labor, and employs its labor under "yellow dog" contract; and for a preliminary injunction and temporary restraining order.

Upon issue joined and after hearing, a preliminary injunction issued and remained in force until final hearing. The cause was tried and submitted upon testimony taken in the form of depositions and other testimony taken in open court. From the admitted facts and undisputed testimony it appears:

That United States Gypsum Company, an Illinois corporation, has for many years engaged in manufacturing and selling gypsum products, such as plaster, wall board, building block, and roof tile. That plaintiff has a quarry or mine and mill at Ft. Dodge, Iowa, and also mills located in New York, Oklahoma, Virginia, and other states, from which mills shipments are made to every state in the Union. The products of the Ft. Dodge mine and mill are shipped into twenty-five to thirty states. The products of the company are principally used in the erection and repairing of buildings and structures, and are sold at points in the various states to dealers, who in turn sell to contractors and builders. The plaintiff's products all contain, either on the product itself or the container thereof, the name of the company in addition to the trade-mark of the particular product. Such name and trade-mark remains on the product or container until used in construction and easily identifies the same. Approximately 90 per cent. of the products sold by plaintiff are erected or used by union labor.

Plaintiff's mine and mill at Ft. Dodge, Iowa, for a period prior to 1921 was oper-

ated upon the so-called closed shop or union basis. At Ft. Dodge, there were two labor unions existing and concerned prior to 1921, viz., Gypsum Mill Workers' Union No. 141, and Gypsum Miners' Union No. 142, and during the period of the World War wages increased very greatly. The contracts with the unions expired on June 30, 1921. In March, 1921, plaintiff suggested to the two unions a continuance of the contract for a period of eighteen months at a materially reduced wage scale. Neither party has made the record very clear as to the negotiations between March and June, but it is quite evident that the men were opposed to any reduction in wages, and no agreement was arrived at. A few days before June 30, 1921, the company announced by published and posted notices a new wage scale, and that the company would operate on an open shop basis after June 30th. On July 1, 1921, the members of the two unions declared and put into effect a strike which continued for a number of weeks. By September, however, approximately from 90 to 95 per cent. of the striking workmen had returned to work on the adjusted scale of wages and under the open shop plan or basis. The plaintiff's mine and mill continued to operate on the open shop basis over the succeeding eight years and until the time of the trial, and presumably are still so operating. Since September, 1921, there has been no controversy between the plaintiff and its workmen, either over wages or conditions of employment. There are four other gypsum concerns at Ft. Dodge, owning and operating mines and mills and engaged in interstate commerce in competition with the plaintiff. All of these other mills and mines are, and since 1921 have been, operated on an open shop plan or basis, commonly called the American plan.

During the summer of 1925, Gypsum Mill Workers' Union No. 141 surrendered its charter, and Gypsum Miners' Union No. 142 has also ceased to exist.

Defendant John Heslop, at the time of the strike in 1921, was an employee of plaintiff, engaged as repair man in the mill, but was not a regular millwright. Heslop did not return to work, and has not since 1921 been employed by plaintiff or any other gypsum industry. None of the other defendants have been employed by plaintiff or any other gypsum concern since 1921, with the exception of defendant Maddox, who was an employee of plaintiff for some time during the year 1926, but who ceased to be employed during that year. None of the defendants have since 1921 sought employment from plaintiff, and defendant Heslop testifies that he would not accept employment under the open shop plan, but that he would seek employment under the closed shop plan. The defendant Russell is a practicing physician and never has been employed by the plaintiff or any other gypsum concern, and his connection with the case grows out of his intimacy with defendant Heslop.

During the months of May and June, 1926, defendant Heslop and a few others organized and procured a charter to Gypsum Miners' and Mill Workers' Union No. 158. All of these unions exist under charters from the International Union of Mine, Mill and Smelter Workers affiliated with the American Federation of Labor. Union No. 158, organized by Heslop and others in June, 1926, seems to have been used exclusively for propaganda purposes. No member of the union is in the employ of the plaintiff nor of any other gypsum company at Ft. Dodge, so far as appears from the record, and its membership is confined to a few individuals, none of which are in any way engaged in the gypsum industry.

The individual defendants, with the exception of Dr. Russell, beginning with the month of September, 1923, at intervals up to and including 1928, have published and distributed a series of circulars addressed "To All Central Trades Councils, Building Trades Councils, and State Federations of Labor," charging in substance that plaintiff is unfair to organized labor and asking that the contents of the circulars be published. The exact wording of the various circulars varied. The circulars of September 5, 1923, charged that the plaintiff and four other gypsum companies located at Ft. Dodge who manufactured "Universal Hair Fibered Plaster, Plymouth Cement Plaster Fibered, Plymouth Cement Plaster, unfibered, Plymouth Wood Fiber Plaster, Plymouth Stucco, Plymouth Molding Plaster, Plymouth Wood Fiber No. 20, Acolite Wood Fiber Plaster, Reground Stucco, Acolite Cement Plaster, Iowana Cement Plaster fibered, Plymouth Cement Plaster Double Fibered, are unfair to Organized Labor." That these companies started an open shop fight on July 1, 1921, and that they are running nonunion mills, and asked co-operation in advertising the fact that these corporations are unfair and that the strike is indorsed by the Ft. Dodge Trades and Labor Assembly. At the foot of this circular is printed, "Fort Dodge Trades and Labor Assembly," and with the seal

thereof. This circular may be said to have had the approval of the Ft. Dodge Trades and Labor Assembly. The testimony shows, however, that no other circular had the approval of that body. At the head of this circular, as at the head of all others, except the last, in large type were the words, "Watch These Materials." The last circular of May, 1928, had the words, "Continue to Watch These Materials." The circular of June 16, 1924, addressed as before, named only the United States Gypsum Company, plaintiff, recited the various products manufactured by that company, that on July 1, 1921, it started a fight for open shop, that it is unfair to organized labor, and that "the strike of the Gypsum Mill Workers' Union and the International Union of Mine, Mill and Smelter Workers is indorsed by the Fort Dodge Trades and Labor Assembly," and asks publications favorable to organized labor to publish the circular. This circular is signed, John Heslop, President Mill Workers, and bears the seal of Gypsum Mill Workers' Union No. 141. Another circular substantially identical was published and sent out under date of November 16, 1924. Another circular substantially identical, but in addition bearing an alleged copy of a contract headed, "Open Shop or American Plan," and referred to in the record as the "yellow dog" contract. Under date of November 25, 1925, another circular was sent in somewhat different language, and as follows:

"The United States Gypsum Co., manufacturing the following gypsum products, Plasterboard, prybar building blocks, domes, rooftile, wood fibre plaster, hair plaster, sand finish and other gypsum products and they are unfair to organized labor. On July 1, 1921, they started a fight for an open shop against the Millworkers Union No. 141 of Fort Dodge, Iowa, and the battle is still on and will so remain until we get a closed shop contract and an eight-hour day. All reasonable means have failed to bring about a settlement, therefore we ask your co-operation in advertising the fact that this corporation is unfair to organized labor. Inasmuch as there have been traitors, who gave out fake circulars, I ask you Brothers to read the 'Yellow Dog' contract as printed below and then use your own judgment as to whether or not the United States Gypsum Co. is unfair to organized labor. And we most earnestly ask your undivided moral support to bring about a closed shop contract and an eight-hour day.

"John Heslop, President,
"Millworkers Union."

In January, 1928, another circular was sent addressed as before, signed "John Heslop, President, Fred W. Knigge, Secretary-Treasurer," bearing the seal of Gypsum Mill Workers, Union No. 141, describing the plaintiff's products, and again referring to the "fight" of July 1, 1921, and stating "the strike is still in effect," and asking co-operation "in advertising the United States Gypsum Company as unfair to organized labor." Under date of May 25, 1928, another circular was sent, somewhat varied in language, but charging that plaintiff still continued the open shop and is working on the principle of the Yellow Dog contract "printed below," and stating: "We have had good results from the former circulars sent out and we again ask your co-operation and moral support in advertising the fact that the United States Gypsum Company is still unfair to organized labor." This circular was signed, "John Heslop, President, Fred Knigge, Secretary, Gypsum Mill Workers Union." Defendant, Heslop testified that as many as eight or nine hundred and twelve hundred copies of each of the circulars had been distributed to organized labor throughout the country, by sending to labor organization officials and to papers and periodicals. He further testified that the purpose was to bring pressure upon the plaintiff through the dealers to whom plaintiff sold; that his hope was that the dealer when approached by local union officials or leaders would cease to patronize plaintiff or handle its materials. The circulars were sent out with the knowledge of all members of the present Union No. 158. In the spring of 1929, Heslop approached the managers of plaintiff at Ft. Dodge and opened a discussion of the subject of unionizing its mine and mill. His suggestion was declined, and he then advised them that his union would have to continue sending the circulars, and a short time thereafter this suit was brought.

It is quite apparent from the testimony and documentary evidence in the case that the purpose of the defendants was to bring such pressure on the plaintiff as would compel plaintiff to abandon the open shop plan and return to a closed shop policy. That the method adopted was to communicate with union officials throughout the country, and particularly wherever the plaintiff sold its products in the course of interstate commerce, and induce such union officials to watch the plaintiff's materials and intimidate the dealers handling them, and thus cause the dealers to cease handling the plaintiff's materials, and to cause union men to refrain from work-

ing on the materials. The testimony further shows that in quite a number of states the defendants' effort had the desired effect; that union officials approached dealers and brought to the attention of the dealers the contents of the circulars in such way as to cause the dealers to cease to purchase plaintiff's product. It would serve no purpose to recapitulate the testimony of the various witnesses who testified from the various parts of the country. Suffice it to say, the testimony shows without conflict that plaintiff's interstate sales were diminished by reason of the activities of the defendants in a material amount, and the volume of circulars being sent to so large a number of local unions and labor papers and periodicals as would doubtless result in material restriction of plaintiff's interstate sales, and would hamper and place a burden upon plaintiff's interstate commerce. Without doubt the defendants' plan and activities embrace all of the principles of the secondary boycott.

Respecting the Dr. Russell letter, I do not find that it has any very material effect upon the case. The letter was, of course, aggravating and largely false. It was written by Dr. Russell, a personal friend of the defendant Heslop, in apparent collaboration with Heslop. Dr. Russell first wrote the letter in longhand and delivered it to Heslop. Heslop had it rewritten in typewriting as I recall with some changes, and the typewritten copies were submitted to Dr. Russell. He approved them and signed ten copies. Heslop distributed a number of these copies, but not generally to the trade. He did, however, send some to periodicals, but the plan of their general circulation was not adopted, and if so was abandoned. Dr. Russell appears to have been a mere tool of Heslop and has in all probability passed out of the scene.

The questions presented for determination on the record are:

1. Did the individual defendants as such and through their organizations, Gypsum Mill Workers' Union No. 141, and Gypsum Miners' Union No. 158, combine to restrain plaintiff's interstate trade under a plan involving the principles of the secondary boycott?

2. Did the execution of said plan result in a material direct restraint of trade?

3. Are the defendants immune under section 20 of the Clayton Act?

■ Respecting the first and second questions, I think there is no room for controversy. The individual defendants were none of them employees of the plaintiff or any other gypsum concern. So far as the record shows the functions and activities of Gypsum Miners' Union No. 158 have been confined to the sending out of these circulars. Gypsum Mill Workers' Union No. 141, if it has any life or existence, only has been such because the individual defendants, exclusive of Russell, have used its name in connection with these circulars. The plan, as stated, was to bring pressure upon the plaintiff to compel it to abandon its open shop policy, and to unionize its mine and mill against its will. The pressure was to be brought by publishing these circulars far and wide, bringing them to the attention of local union labor leaders with the expectation that those organizations and individuals would bring them to the attention of the dealers, customers of the plaintiff, and of the workmen on jobs that used plaintiff's material, and thus intimidate dealers and induce them to refrain from using plaintiff's materials. "Watch These Materials," "Continue to Watch These Materials," were the slogans that were to be proclaimed, and in addition the declaration that the plaintiff was unfair to union labor. One would certainly be blind not to be able to perceive the intent, purpose, and natural effect of such plan if put in execution. I therefore find that the individual defendants, exclusive of Russell, individually and through the organizations named, did combine to restrain plaintiff's interstate trade and commerce by a plan involving the principles of the secondary boycott. I further find that while the restraint and actual damage has probably not been great in volume compared with the total output of plaintiff's mines and mills, yet the plan once under way, considering the great number of labor organizations and labor papers and periodicals in the country to whom such circulars were and were to be sent, a very material restraint of trade would likely be effected, to the plaintiff's irreparable damage.

■ Were the defendants immune under section 20 of the Clayton Act (29 USCA § 52)? None of the defendants were employees, as stated, nor were they seeking employment, nor had they been recently employees. Eight years had elapsed since any but one of them had been employed, and several years had elapsed since he had left its employ. I think section 20 of the Clayton Act has no application in such circumstances. Examination of the following cited decisions of the Supreme Court of the United States, covering a period of approximately twenty years, will disclose

232

the principles applicable to such cases, with any growth or mutations thereof settled during the period stated: Loewe v. Lawlor, 208 U. S. 274, 28 S. Ct. 301, 52 L. Ed. 488, 13 Ann. Cas. 815; Gompers v. Buck's Stove & Range Co., 221 U. S. 418, 31 S. Ct. 492, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874; Eastern States Lumber Ass'n v. United States, 234 U. S. 600, 34 S. Ct. 951, 58 L. Ed. 1490, L. R. A. 1915A, 788; Lawlor v. Loewe, 235 U. S. 522, 35 S. Ct. 170, 59 L. Ed. 341; Duplex, etc., Co. v. Deering, 254 U. S. 443, 41 S. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196; American Steel Foundries v. Tri-City Council, 257 U. S. 184, 42 S. Ct. 72, 66 L. Ed. 189, 27 A. L. R. 360; Truax v. Corrigan, 257 U. S. 312, 42 S. Ct. 124, 66 L. Ed. 254, 27 A. L. R. 375; Bedford Cut Stone Co. v. Journeymen Stone Cutters' Ass'n, 274 U. S. 37, 47 S. Ct. 522, 71 L. Ed. 916, 54 A. L. R. 791.

Finally, I am of opinion that the interlocutory injunction heretofore decreed should be made permanent with such modifications as will make the same conform to this opinion. I think the form of final decree approved by the Supreme Court of the United States in Bedford Cut Stone Co. et al. v. Journeymen Stone Cutters' Association of North America et al., supra, mutatis mutandis, sufficient and proper in this case. Counsel for plaintiff will prepare the final decree in conformity with this opinion, and submit the same for approval within ten days.