ON MOTION FOB REHEARING

DICKINSON, Presiding Justice,
for the Court:
¶ 1. The motion for rehearing filed by Georgia Pacific Corporation is deniéd. The motion for rehearing filed by Cook Timber Company, Inc., is denied. The previous opinions issued in this case are withdrawri, and these opinions are substituted therefor.
¶ 2. Cook Timber Company sued Georgia Pacific Corporation, claiming breach of contract and antitrust violations, both unilaterally and through a conspiracy with other market participants.[1] The circuit judge granted Georgia Pacific a directed *120 verdict on Cook Timber’s conspiracy and breach-of-contract claim, but the jury returned a yerdict for Cook Timber on its unilateral antitrust claim. Because Cook Timber failed to present sufficient evidence to support its unilateral antitrust claims, we reverse the jury’s verdict on that claim. We also affirm the circuit judge’s decision to grant Georgia Pacific a directed verdict on the conspiracy claim. But we reverse the directed verdict on Cook Timber’s breach-of-contract claim, and we remand for a new trial on that claim.
FACTS AND PROCEDURAL HISTORY
¶3. Cook Timber, a logging company based in Bay Springs, Mississippi, has been in operation since 1983. Georgia Pacific is a national wood-processing company with several facilities in, Mississippi. In southeast Mississippi, Georgia Pacific operated the Leaf River Group. This group consisted of five mills, including the Tay-lorsville Plywood Plant, Taylorsville Chip Mill,. Bay Springs Sawmill, New Augusta Sawmill, arid the, Leaf River Pulp Mill.
,¶ 4. In 1983, Cook Timber entered into a contract with Georgia Pacific, and from then until 2000, Cook Timber worked exclusively with Georgia Pacific. Eighty to ninety percent of Cook Timber’s wood was hauled to the Taylorsville Plywood Plant and Bay Springs Sawmill. The remainder was hauled to the Leaf River Pulp Mill. In March 2000, Georgia Pacific notified Cook Timber by letter that its Leaf River Pulp Mill no longer would receive any pine pulpwood deliveries from • Cook Timber. Cook Timber then filed this suit.
¶ 5. After the circuit judge granted a directed verdict on Cook Timber’s breach-of-contract and conspiracy claims, the jury returned a verdict for both actual and punitive damages against Georgia Pacific. Georgia Pacific appealed, arguing that the circuit court had erred by admitting the testimony of Cook Timber’s expert witness, Dr. William Shughart; that Cook Timber had presented insufficient evidence to prove its unilateral antitrust claim; that the circuit court had improperly instructed the jury on the elements of Cook Timber’s unilateral antitrust claim; and that the circuit court had erred by permitting the jury to consider punitive damages for the antitrust violation. Cook Timber cross-appealed the directed verdicts on its breach-of-contract and conspiracy claims.
¶ 6. We find that Cook Timber failed to prove that Georgia Pacific committed unilateral antitrust violations. We also affirm the circuit ■ court’s directed verdict on the conspiracy claim. But we find that Cook Timber presented sufficient evidence to survive a directed verdict on its breach-of-contract claim, and we. reverse and remand for a new trial on that claim.
ANALYSIS

Cook Timber’s Section 75-21-3 Claim

¶ 7. Cook Timber’s three claims center on Georgia Pacific’s efforts to cut the cost it pays, timber suppliers for wood. Each claim rests on a distinct legal theory. The circuit judge allowed the jury to consider only one of the three legal theories. That claim was brought under Mississippi Code Section 75-21-3.
¶8. There is an important difference between Cook Timber’s claim under Mississippi Code Section 75-21-3-on which the jury based its verdict — and Mississippi Codé Section 75-21-1-on which the circuit judge granted a directed verdict. Both statutes concern what can be characterized broadly as antitrust regulations. Section 75-21-1, which regulates actions by trusts or combines, states:
*121 A trust or combine is a combination, contract, understanding or agreement, expressed or implied, between two or more persons, corporations or firms or association of persons or between any one or more of either with one or more of the others [when used to engage in certain prohibited business practices.][2]
¶ 9. Section 75-21-3, on the other hand, regulates the conduct of “[a]ny corporation, domestic or foreign, or individual, partnership, or association of persons whatsoever, who, with intent to accomplish the results herein prohibited or‘without such intent, shall” engage in certain prohibited business practices.[3] In other words, Section 75-21-1 prohibits agreements between market participants to engage in the prohibited practicés, while Section 75-21-3 prohibits unilateral action by a market participant to engage in the prohibited practices.
-¶ 10. With regard to Section 75-21-3, on which the jury based its verdict, Cook Timber failed to present sufficient evidence.. That section states:
Any corporation, domestic or foreign, or individual, partnership, or association of persons whatsoever, who, with intent to accomplish the results herein prohibited or without such intent, shall accomplish such results to a degree inimical to public welfare, and shall thus:
(a) Restrain or attempt to restrain the freedom of trade or production;
(b) Or shall monopolize or attempt to monopolize the production, control or sale of any commodity, or the prosecution, management or control of any kind, class or description of business;
(c) Or shall engross[;] forestall or attempt to engross or forestall any commodity;
(d) Or shall destroy or attempt to destroy competition in the manufacture or sale of a commodity, by selling or offering the same for sale at a lower price at one place in the state than another or buying or offering to buy a commodity at a higher price at -one place in the state than another, differences of freight and other necessary expenses of sale and delivery considered;
(e) Or shall destroy or attempt to destroy competition by rendering any service or manipulating, handling or storing any commodity for. a .less price in .one locality than in another, the differences in the necessary expenses of carrying on the business considered, shall be deemed and held a trust and combine within the meaning and purpose of this section, and shall be liable to the pains, penalties, fines, forfeitures, judgments, and recoveries denounced against trusts and combines and shall be proceeded against in manner and form herein provided, as in case of cither trusts and combines.
It shall be sufficient to make out a prima facie case of a violation of subdivision (e) of this section to show lower charge for the service therein mentioned in one ' locality than another, or to show a higher price paid for a commodity in one locality than another, differences of freight and other necessary expenses of operating business considered.[4]
¶ 11. Cook Timber’s case essentially boiled down to five pieces of evidence: (1) references to Georgia Pacific’s “Project *122 Hawker” price-reduction effort, (2) Georgia Pacific’s decision to purchase timber only from suppliers who provided the most consistent prices, (3) Georgia Pacific’s decision to stockpile its timber inventory so it could refuse to purchase timber when prices were too high, (4) Georgia Pacific’s decision to publish the prices it paid for timber, and (5) Georgia Pacific’s contractual right to cull wood not meeting its quality specifications. This evidence, even when viewed in the light most favorable to the verdict, does not support it.
¶ 12. Conduct that violates Section 75-21-3 must fall under at least one of subsections (a) through (e).[5] Clearly, subsections (d) and (e) are inapplicable because both address differential pricing between localities in the state, and Cook Timber does not allege that Georgia Pacific engaged in this practice.[6]
■ ¶ 13. Subsection (b) prohibits a market participant from “monopoliz[ing] or attempting] to monopolize the production, control or sale of any commodity, or the prosecution, management or control of any kind, class or description of business.”[7] Monopoly is defined as “1. [c]ontrol or advantage obtained by one supplier or producer over the commercial market within a given region. 2. The market condition existing when only one economic entity produces a particular product or provides a particular service.”[8] No evidence supports a conclusion that Georgia Pacific monopolized or attempted to monopolize its industry. In fact, this case does not involve claims about Georgia Pacific’s industry itself, but rather from whom it decided to purchase raw material. And the existence of competitors forms the basis of some of Cook Timber’s claims.
¶ 14. This leaves subsections (a) and (c). Subsection (a) prohibits a business from “[r]estrain[ing] or attempting] to restrain the freedom of trade or production.”[9] With regard to the restraint-of-trade provision, this Court has said that “our antitrust statute was only intended to embrace within its provisions those contracts in restraint of trade which were invalid as against public policy before the enactment of said statute.”[10] No authority supports the view that, before this statute’s adoption, businesses were prohibited from seeking to purchase material for the lowest possible cost.
¶ 15. Finally, subsection (c) prohibits a business from “engrossing], forestalling] or attempting] to engross or forestall any commodity.”[11] Under an older version of the statute, this Court held that the statute prevented businesses from fixing prices for commodities outside the law of supply and demand.[12] For instance, that prohibition precluded an agreement between oyster sellers always to sell oysters at a fixed price.[13] While the current version of the statute does not contain the phrase price fixing, engross, in the antitrust sense, means “to buy large quantities of (a stock or commodity) in an effort to *123 corner the market and control the price.”[14] But this case involves Georgia Pacific’s actions as a consumer, not a seller. It cannot be said Georgia Pacific attempted to comer a market when it is not acting as a seller in that market. Likewise, “forestall” means “[t]o buy (goods) for the purpose of reselling at a higher price'.”[15] Georgia Pacific however, attempts to purchase timber at the lowest possible price from suppliers who deliver at a consistent price, and it intends to stockpile timber in anticipation of higher future timber prices. This strategy and conduct simply is not illegal.
¶ 16. Taking all Cook Timber’s proof as true, it failed to present sufficient evidence to prove any violation of Section 75-21-3, so we reverse the jury’s verdict based on that statute. Because we reverse the jury’s verdict, we need hot address Georgia Pacific’s expert-testimony, jury-instruction, and punitive-damage claims.

Cook Timber’s Section 75-21-1 Claim

¶ 17. As discussed above, while Section 75-21-3 governs unilateral conduct, Section 75-21-1 controls conduct by trusts or combines. That section states:
A trust or combine is a combination, contract, understanding or agreement, expressed or implied, between two or more persons, corporations or firms or association of persons or between any one or more of either with one or more of the others, when inimical to public welfare and the effect of which would be:
(a) To restrain trade;
(b) To limit, increase or reduce the price of a commodity;
■ (c) To limit, increase or reduce the production or output of a commodity;
(d) To hinder competition in the production, importation, manufacture, transportation, sale or purchase of a commodity;
(e) To engross or forestall a commodity;
(f) To issue, own or hold the certificate of stock of any trust and combine within the spirit of this chapter knowing it to be such at the time of the issue or the acquisition or holding such certificate; or
(g) To place the control to any extent of business or of the proceeds or earnings thereof, contrary to the .spirit and meaning of this chapter, in the power of trustees, by whatever name called; or
(h) To enable or empower any other person than themselves, their proper officers, agents and employees to dictate or control the management of business, contrary ‘to the spirit and meaning of this chapter; or
(i) To unite or pool interest in the importation, manufacture, production, transportation, or price of a commodity, contrary to the spirit and meaning of this chapter.[16]
*124 ¶ 18. A threshold requirement to any violation of this statute is “a combination, contract, understanding or, agreement” to commit the prohibited practices. We find that the circuit judge properly granted a directed verdict on this claim because Cook Timber put forth insufficient evidence to establish the necessary agreement between market participants.
¶ 19. We review “a trial court’s grant or denial of a motion for directed verdict de novo.”[17] The motion should be granted where, taking all evidence in favor of the nonmoving party as true and drawing all favorable inferences from that evidence, no reasonable juror could find that the evidence supports a verdict in favor of that party.[18] '
¶20. A price-fixing conspiracy may be established by circumstantial evidence.[19] But, as the United States Supreme Court has said with regard to the federal Sherman Act:
“[T]he crucial question” is whether the challenged anticompetitive conduct “stems from independent decision or from an agreement, tacit or express.” While a showing of parallel “business behavior is admissible circumstantial evidence from which the fact finder may infer agreement,” it falls short of “conclusively establishing agreement or ... itself constituting a Sherman Act offense.” Even “conscious parallelism,” a common reaction of “firms in a concentrated market that recognize their shared economic interests and their interdependence with respect to price and output decisions” is “not in itself unlawful.” [20]
Here, the evidence at most establishes conscious parallelism.
¶ 21. The only evidence of conduct involving other market participants is an email , between Georgia Pacific executives. That email stated that:
I am getting reports that some of the competition is pulling their price down about as fast as we are. I am. of the opinion that we are the ones making the difference and everyone else is following.
[[Image here]]
The difference this in this year and 1995[sic]is that all the competition is wanting to do the same thing.
¶ 22. This email reflects an observation and falls far short of establishing either an express or implied agreement between the parties. No reasonable juror, without engaging in speculation, could read this email to say more than that the author of the email observed that other companies were now paying lower prices for timber. So we affirm the circuit judge’s decision to grant a directed verdict on this claim.

Cook Timber’s Breach-of-Contract Claim

¶23. Cook Timber’s breach-of-contract claim centers on Georgia Pacific’s right Under its contract to cull wood that *125 did not meet its quality specifications, to forego payment for that wood, and keep it nevertheless. It also involves Georgia Pacific’s failure to maintain scale tickets with the statutorily prescribed information and Cook Timber’s claim that,this creates a presumption that Georgia Pacific did not properly scale or measure the wood.
¶24. Mississippi Code Section 75-27-113(4) provides that:
Scale tickets shall be made available to the haulers and timber owners for each load before the close of the following business day and shall include'the measured volume or weight, the standard of weight or measurement used, and the basis and amount of any deductions. ■
¶25. Here, the scale tickets entered into evidence failed to include the statutorily required information. The scale tickets from the Taylorsville Mill and the Bay Springs Mill failed to identify the basis for any dockage or the amount of the dockage. Ricky Kelly, a former Georgia Pacific manager, testified that each scale ticket had symbols representing the reasons for the dockage and also listed the weight that was docked. The three scale tickets in the record, however, do not state the basis for or the amount Cook Timber was docked.
¶ 26. Cook Timber learned of the .dock-age amount only .after it received a settlement sheet, and compared the settlement sheet with the scale ticket. So Cook Timber was deprived of this information by Georgia Pacific’s conduct, and we find that this raised a rebuttable presumption that , Georgia Pacific did not properly dock the wood.[21]
1127. Also, Cook Timber presented an email from a Georgia Pacific executive, which said:
I am fully aware that if you come out of the gate with major cull increases'you will drive up prices and drive away supply. It is your job to make these changes subtle and not make this look like an effort to lower- wood costs. Howr ever, the bottom line is that we have to make these-changes now. ■
¶ 28! This email could be read two ways. It might mean that Georgia Pacific had encountered a large amount of substandard wood, and the author of the email was warning against culling all of it because doing so might have appeared to have been an attempt to save money, rather than to comply,with the contract. Or, it could be read as an attempt to begin slowly to cull wood that was not substandard. That is to say, reasonable jurors could read the email to say that Georgia Pacific culled wood — which it was entitled to keep without payment — not, based on the wood’s failure to conform to, its quality .specifications, but as a way to, take quality wood without payment. That, coupled with the adverse presumption for failure to maintain scale tickets, provided. sufficient evidence to reach a jury verdict on the breach-of-contraet claim.
¶ 29. The existence of a contract between the parties is not disputed. Under the contract, Georgia Pacific had a right to cull and keep wood without payment, but only when the wood failed to, meet its quality specifications. We find that a reasonable juror could conclude that Georgia Pacific culléd wood for other reasons— mainly to lower ‘prices — arid that this breached its contract with Cook Timber. So the directed, verdict was not proper on this claim.
CONCLUSION
¶ 30. We find that :Cook Timber failed to present sufficient evidence to' sustain the jury’s verdict based on a unilateral *126 antitrust violation. So we reverse and render judgment in Georgia Pacific’s favor on that claim. We find that the circuit judge properly granted a directed verdict on Cook Timber’s conspiracy claim. So we affirm that ruling. Finally, we find that the circuit judge erred by granting Georgia Pacific a directed verdict on Cook Timber’s breach-of-contract claim. So we reverse and remand for a new trial on that claim.
¶ 31. ON DIRECT APPEAL: REVERSED AND RENDERED. ON CROSS-APPEAL: AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
WALLER, C.J., LAMAR, COLEMAN AND MAXWELL, JJ., CONCUR. MAXWELL, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J.; RANDOLPH, P.J., JOINS IN PART. KING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY RANDOLPH, P.J., AND KITCHENS, J. BEAM, J., NOT PARTICIPATING.

. This case involves additional plaintiffs and defendants, but all parties agreed only Cook Timber and Georgia Pacific would proceed to trial. i

. Miss.Code Ann. § 75-21-1 (Rev.2009),.

. Miss.Code Ann. § 75-21-3 (Rev.2009).

. id.

. Id.

. Id.

. Id.

. Monopoly, Black’s Law Dictionary 862 (abr. 9th ed.).

. Miss.Code Ann. § 75-21-3(a) (Rev.2009).

. Brown v. Staple Cotton Coop. Ass’n, 132 Miss. 859, 96 So. 849, 854 (1923) (citing Yazoo & M.V.R. Co. v. Crawford, 107 Miss. 355, 65 So. 462 (1914)).

. Miss.Code Ann. § 75-21-3(c) (Rev.2009).

. Barataria Canning Co. v. Joulian, 80 Miss. 555, 31 So. 961, 962 (1902).

. Id.

.Engross, Black's Law Dictionary 478 (abr. 9th ed.). As it relates to buying a commodity, "engross" relates only to efforts “to corner the market and .control the price” of a commodity. Id. By way of illustration, an oil company engrosses a commodity when it purchases all the oil in Mississippi for the purpose of setting the price other purchasers must pay for oil. But, if a trucking company purchased all the oil in Mississippi — not “in an effort to corner the market and control the price” of oil, but because it needed that oil to run its trucks, it would not have engrossed the commodity. Here, Georgia Pacific is the latter, not the former. It purchased timber as a raw material for its products, not to participate as a seller in the timber market.

. Forestall, Black’s Law Dictionary 564 (abr. 9th ed.).

. Miss.Code Ann. § 75-21-1 (Rev.2009).

. Solanki v. Ervin, 21 So.3d 552, 556 (Miss. 2009) (citing Pierce v. Cook, 992 So.2d 612, 616 (Miss.2008); Pace v. Fin. Sec. Life, 608 So.2d 1135, 1138 (Miss.1992)).

. Solanki, 21 So.3d at 559 (quoting White v. Thomason, 310 So.2d 914, 916-17 (Miss.1975)).

. Wagley v. Colonial Baking Co., 208 Miss. 815, 856, 45 So.2d 717, 725 (1950).

. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 553-54, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007) (quoting Theatre Enters., Inc. v. Paramount Film Distrib. Corp., 346 U.S. 537, 540-41, 74 S.Ct. 257, 98 L.Ed. 273 (1954); Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 227, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993)).

. DeLaughter v. Lawrence Cty. Hosp., 601 So.2d 818, 821-22 (Miss.1992).